IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 13, 2016 Session

## STATE OF TENNESSEE v. EDWARD JOSEPH BENESCH II

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2013-CR-234      Larry J. Wallace, Judge**

_____

## No. M2015-02124-CCA-R3-CD

_____

The Defendant, Edward Joseph Benesch II, stands convicted by a Dickson County jury of aggravated child neglect and voluntary manslaughter, for which the trial court sentenced him to an effective term of eighteen years' incarceration. In this appeal as of right, the Defendant raises the following allegations of error: (1) that the trial court erred by denying the Defendant's motion to suppress his statement to police after he first requested an attorney and that request did not need clarification in the Defendant's opinion; (2) that the evidence was insufficient to support the Defendant's convictions because he did not intentionally neglect the victim and because the element of adequate provocation was absent; (3) that the trial court abused its discretion when it admitted photographs of the victim taken at the crime scene and during the victim's autopsy given their gruesome nature; (4) that trial court erred by allowing a paramedic to testify as an expert about the "significance of the force" that caused the victim's injuries; (5) that it was improper for the trial court to allow two witnesses, Shannon Edmonson and Shara Tisdale, to testify about the Defendant's alleged drug usage and drugs being found in his home; (6) that the trial court should not have allowed testimony from the Defendant's next-door neighbor that bore "no indicia of reliability and was completely unverifiable"; (7) that the trial court's refusal to allow the Defendant's "mitigation expert" to testify regarding how the Defendant told her he fell on the victim violated the Defendant's constitutional right to present a defense; and (8) that the trial court erred when it allowed the State to play, as a prior inconsistent statement, the video recording of Judith Lane's interview with law enforcement.[1] Following our review of the record and the applicable authorities, we must conclude that the evidence was insufficient to support the Defendant's conviction for voluntary manslaughter because the Defendant was not

_____

[1] For the sake of clarity, we have combined and reordered several of the issues as presented by the Defendant in his appellate brief.

adequately provoked by the eighteen-month-old victim, and therefore, that conviction is reversed and vacated. However, because the proof is sufficient to support the lesser-included offense of reckless homicide, we remand this matter to the trial court for entry of an amended judgment reflecting a reckless homicide conviction and imposition of a consecutive, four-year sentence for that conviction. The Defendant's remaining issues do not entitle him to relief, and his conviction for aggravated child neglect is affirmed. Accordingly, the trial court's judgments are affirmed in part and reversed in part.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; Case Remanded

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Olin J. Baker and William Walker Wade, Charlotte, Tennessee, for the appellant, Edward Joseph Benesch II.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Wendell Ray Crouch, Jr., District Attorney General; and Carey J. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

This case arose following the death of the eighteen-month-old victim while she was in the exclusive care, custody, and control of the Defendant. The Defendant was charged with first degree felony murder in the perpetration of aggravated child abuse, first degree felony murder in the perpetration of aggravated child neglect, aggravated child abuse, and aggravated child neglect. See Tenn. Code Ann. §§ 39-13-202, -15-402. The Defendant proceeded to a trial by jury where the following evidence was adduced.

A. The Victim's Death and the Defendant's arrest. Ms. Kimberly Perez was the victim's aunt. Ms. Perez testified that the victim's mother was in jail in March 2013 and that, during this time, the Defendant was caring for the victim and the victim's three-year-old sister. Moreover, when the victim's mother was arrested, she was pregnant with her seventh child, and the Defendant was the father of this baby.

On Thursday morning, March 7, 2013, Ms. Perez was asleep on her couch when she was awakened by the Defendant, who was telling her that the victim was "sick" and "need[ed] to go to the hospital." Ms. Perez instructed the Defendant to bring the victim

inside, and Ms. Perez went to use the restroom. When Ms. Perez returned to the living room, the Defendant "was at the door" with the victim "on his shoulder." Ms. Perez took the victim from the Defendant and laid her on the floor. At that time, the victim "was just limp and unresponsive," according to Ms. Perez. Ms. Perez tried to arouse the victim by talking to her and touching her, but Ms. Perez realized that the victim was not breathing. Ms. Perez explained the victim's state: "She wasn't moving. Her eyes had rolled back when I put her down and [were] kind of half open." When Ms. Perez "knew something was wrong" with the victim, she phoned 9-1-1 and began performing CPR on the victim while receiving instructions from the 9-1-1 operator.

According to Ms. Perez, the Defendant immediately left her home after handing the victim to her. The Defendant had also brought the victim's three-year-old sister with him, leaving her with Ms. Perez as well. Ms. Perez opined that the Defendant "left in a hurry" because she could "hear gravel spinning everywhere" in her driveway.

Ms. Perez testified that she had cared for the victim the weekend prior to these events. Ms. Perez stated that she did not notice any bruising on the victim's body during those several days, noticing only that the victim had a "bite mark on her" face that was supposedly "from another child" and "some discolorations on her face." Ms. Perez also read aloud from a statement she gave[2]:

> Perez reiterated [the Defendant's] account that he tripped and fell on top of [the victim] the night before, then he noticed she was wheezing late last night. Perez stated all she knew when [the Defendant] brought her in was the baby was limp. Perez repeated when she had asked him why he had not called 9-1-1. [The Defendant] replied, because he was scared.

Emergency personnel and law enforcement responded to the call from Ms. Perez's residence of "a child who was not breathing." Officer Scott Anthony Hull, with the City of Dickson Police Department, arrived on the scene at approximately 7:43 a.m. and saw the victim lying on a blanket in the living room. Officer Hull checked for a pulse and signs of breathing but found none. He further described the victim's condition:

> When I walked in, she was facing—her head was towards the TV, feet [were] towards the crib. . . . Behind one of her ears was a large knot, bruising. She had bruises all over her abdominal cavity, her sides, her back, deep purple bruises, and she was just—she was lifeless.

---

[2]    After reading the statement, Ms. Perez recalled the interview and remembered the Defendant's statements to her.

Thereafter, Officer Hull took over CPR from Ms. Perez.

When Officer Hull saw "red lights pull up to the house," he thought it was an ambulance, so he carried the victim outside. Officer Hull said that he "knelt down" and "continued CPR on the [victim]" but that, after observing "the first responders from the fire department . . . getting their stuff together," he "ran back into the house with [the victim] to keep her warm[.]" According to Officer Hull, he renewed CPR efforts once back inside until "some lady" replaced him.

Officer Hull also testified that, when he took the victim outside, she was "already rigid" and that she "wasn't limp like a normal child would be." Moreover, once outside, Officer Hull saw that the victim's bruises "were more extreme than what [he] thought they were" initially. On cross-examination, Officer Hull agreed that "over the course of time as a body sits and cools, it begins to get a purplish color[.]"

Heather Bradley testified that she was a paramedic with the Dickson County Ambulance Service and that she responded to the call at Ms. Perez's residence that morning. Ms. Bradley stated that, when she arrived, the victim "was unresponsive, cold to the touch, apnea, [and] pulseless." Ms. Bradley also noticed "multiple bruises" on the victim's head, face, chest, back, legs, and arms. Furthermore, Ms. Bradley observed Officer Hull and "two first responders" with the fire department attempting "some treatment or resuscitation efforts" on the victim. Ms. Bradley then helped place an automated external defibrillator device ("AED") on the victim. However, the AED did not detect a heartbeat, according to Ms. Bradley, so "[n]o shock was advised" and no further resuscitation attempts were performed.

Ms. Bradley explained that, during this time, her "partner had been on the phone with the doctor who gives us permission to stop if [her partner] has painted the picture for [the doctor] that there [are] no signs consistent with life." Based upon her partner's representations to this doctor, the doctor pronounced the victim dead on the scene. Ms. Bradley informed that, had she been the one on the phone with the doctor instead of her partner, she would have reported that the victim "was not breathing" and "there was no pulse" and would have described "the bruising and discoloration that appeared to be on [the victim's] body." Ms. Bradley characterized this bruising as "significant."

That same morning, Officer Jerry Booker, with the Dickson County Sheriff's Office, went looking for the Defendant at the Defendant's home on Rocky Road. Officer Booker arrived at 11:33 a.m. and knocked on the door, but no one answered. According to Officer Booker, while he was standing at the Defendant's front door, he could smell "a typical household cleaner smell" that "was a little stronger . . . than you would expect[.]"

Ultimately, the Defendant was found at the home of Judith Lane on Dowdy Road, and he was arrested without incident by Dickson County Sherriff's Officer Michael Richard Eggiman at 11:36 a.m. that morning. The Defendant's vehicle, however, was found "quite a ways" away from the Dowdy Road residence unattended in a K-Mart store parking lot. According to Officer Eggiman, the Defendant, upon his arrest, asked "is the girl okay?" and said, "I was just about to call you."

B. Rocky Road Residence. Shara Tisdale, the Defendant's sister, testified that the Defendant, the victim, and the victim's three-year-old sister were living with her in a mobile home on Rocky Road in March 2013. Ms. Tisdale's boyfriend, Shannon Edmonson, also stayed with her "off and on." According to Ms. Tisdale, the mobile home was "a pretty good ways out of town," and it took at least ten to fifteen minutes to get from her residence "back to Dickson."

On the evening of March 6, 2013, Ms. Tisdale had some girlfriends over to spend the night; Mr. Edmonson, the Defendant, the two children were also there. Ms. Tisdale testified that she got the children ready for bed that evening, which usually included giving them a bath and putting their pajamas on them. Ms. Tisdale stated that she did not observe any bruising or other injuries to the victim at that time, although the victim did have a "bite above her ear" from "the week prior."

When one of Ms. Tisdale's friends "got a phone call from her niece saying she needed her to baby sit," the group decided not to have a "sleepover" at Ms. Tisdale's but to return to Dickson and "stay over at the niece's house." Ms. Tisdale, along with her two friends and Mr. Edmonson, got in Ms. Tisdale's car and left the residence "close to dark." Ms. Tisdale dropped Mr. Edmonson off at his mother's house, and the women proceeded to "the niece's house," which left the Defendant alone with the victim and the victim's sister at the Rocky Road residence. According to Ms. Tisdale, when she left, the Defendant was awake and playing with the two girls. Ms. Tisdale affirmed that she had not seen the Defendant drinking or using drugs that evening.

During the morning hours on the following day, March 7, 2013, Ms. Tisdale received several text messages from the Defendant—(1) "Call me now."; (2) "The baby is hurt."; and (3) "[P]ick up the phone, the baby is hurt bad." According to Ms. Tisdale, the Defendant's last message was sent at 8:14 a.m. while she was at work and said, "If anybody asks, I've not had the kids in two days, I've been with you." In addition, Ms. Tisdale spoke with the Defendant that morning, and she said "[h]e was scared" and crying. He did not sound intoxicated, in Ms. Tisdale's opinion.

Ms. Tisdale also averred that the Defendant had not done drugs in her presence "in a month" before this incident. Ms. Tisdale had no knowledge of "any illegal drugs or

-5-

drug paraphernalia" in her home and asserted that she did not have any there. Furthermore, according to Ms. Tisdale, the Defendant "loved [the two girls] very much[,]" and she had never noticed abusive behavior by the Defendant. Ms. Tisdale testified that the Defendant had kept her daughter, Judith Lane's children, and "several of [their] other friends' kids" without any problems. Ms. Tisdale stated that, if the Defendant was "around children, he wouldn't drink to excess."

In addition, Ms. Tisdale was asked about her neighbor John Rayburn. Ms. Tisdale stated that she "honestly recall[ed] seeing him maybe twice the whole entire time" she lived in the mobile home and that she was unsure if he lived next-door. When asked if Mr. Rayburn ever came over to their house, Ms. Tisdale replied, "He stood in the yard one time."

Mr. Edmonson also testified, providing similar testimony to Ms. Tisdale's. Mr. Edmonson said that he did not see the Defendant use cocaine on the evening of March 6, 2013, and that he was unaware of cocaine in the trailer that evening. Mr. Edmonson also averred that he would be surprised to learn that a straw with cocaine residue on it was found inside the house. Mr. Edmonson acknowledged that he gave a statement to law enforcement that the Defendant appeared to have been drinking or was "messed up" earlier in the day.

Shatika Chantel Gilbert, one of Ms. Tisdale's girlfriends present on the evening of March 6, 2013, relayed her version of the events, which was again similar to Ms. Tisdale's. Ms. Gilbert likewise did not see any visible bruises or marks on the victim when they gave her a bath that evening nor did she observe the Defendant do cocaine that evening. Ms. Gilbert estimated that they left the Rocky Road residence around 9:45 or 10:00 p.m., and she stated that the Defendant "was fine when [they] left him." Furthermore, according to Ms. Gilbert, Ms. Tisdale kept two air mattresses in the trailer, and Ms. Gilbert saw those mattresses inside the mobile home that evening because they were going to have a sleepover.

John Rayburn testified that he lived next door to the Defendant. Mr. Rayburn said that he visited the Defendant on the evening of March 6, 2013, and that the victim and the victim's sister were there along with "a white man and a black man[.]" According to Mr. Rayburn, while he was inside the Defendant's home, he observed the Defendant drinking beer and snorting cocaine.

Furthermore, Mr. Rayburn stated that "[t]he oldest girl took [the victim's] sock off and the little girl lost the sock." The Defendant was angered by the victim's losing her sock, so the Defendant "hit [the victim] like a man," striking her three times in the ribs and punching her in the head. Mr. Rayburn said that the victim cried after the Defendant

hit her, and when asked how long she cried, Mr. Rayburn replied that the victim "cried all the time [he] was there." The Defendant threw the victim into a closet after striking her, according to Mr. Rayburn. Additionally, the Defendant said to Mr. Rayburn that he was tired of caring for the two girls while their mother was incarcerated and could not wait until she was released. Mr. Rayburn left the residence after witnessing the violence. Mr. Rayburn estimated that he was only inside the Defendant's home for about five to ten minutes that evening.

Mr. Rayburn agreed that he did not immediately report what he saw to law enforcement, only doing so the following morning after speaking with both his mother and his wife. Additionally, Mr. Rayburn was shown two photographs and identified Shannon Edmonson and Jonathan Lane as the two people he saw inside the Defendant's home on the evening of March 6, 2013. Mr. Rayburn claimed that he had seen these two men "[m]ultiple times."

C. Additional Witnesses' Testimony. Judith Lane testified that the Defendant was a life-long friend of her brother's and that she and the Defendant spoke on a regular basis. Ms. Lane testified that, on the morning of March 7, 2013, "[b]etween 7:00 and 7:30, like 7:20 something maybe," the Defendant called her while she was dropping her kids off at school. The Defendant asked her for a ride because his car had broken down. Ms. Lane told him that he had to first get permission from her mother, Tammy Conner, because Ms. Lane was driving her mother's car. After Ms. Conner gave her permission, the Defendant called Ms. Lane back to tell Ms. Lane to pick him up at a local Kroger.

Ms. Lane testified that, after she picked the Defendant up at the Kroger, he said to her that there "was something wrong with" the victim. Specifically, the details of that conversation were as follows:

> He told me that he had fell [sic] down the steps and fell on [the victim] and that—the night before and that he thought that she was okay because she cried for a little bit but then she was fine, and he said she went to bed and that everything was okay. And then the next morning, he felt like something was wrong with [the victim]. . . . He took [the victim] and [the victim's sister] to [Ms. Perez's house].

Ms. Lane described the Defendant's demeanor as he conveyed these details to her: "He looked scared and really quiet. I mean, he was really quiet anyway. He was direct and to the point. He didn't say a whole lot of extra stuff." She said that they did not talk about whether the Defendant should have sought medical care for the victim before she picked him up. Ultimately, Ms. Lane dropped the Defendant off at her house on Dowdy Road, and she left.

On cross-examination, Ms. Lane stated that she "[w]ould not have any problem leaving [her] children with [the Defendant]" and that the Defendant had in fact cared for her children before. She later clarified,

> Oh, I'm sorry. This says that I concluded that [the Defendant] had never had the kids, not for five seconds. And it also says that not because I didn't think he could take care of them, but—and not that I didn't think he was incapable of showing compassion and love for them, but just because it was a bad situation and you don't take care of kids that are not yours.

Ms. Lane confirmed that she gave a statement to Tennessee Bureau of Investigation ("TBI") Agent Mike Breedlove and Dickson County Sheriff's Detective Stacey Patterson following the victim's death. The statement was played for the jury. After watching the recording of her interview, Ms. Lane recalled having spoken with the Defendant about taking the victim to the emergency room prior to picking him up at the Kroger.[3] Ms. Lane also summarized the Defendant's version that he relayed to her: "[The Defendant] was coming down the steps to go to the store. He had [the victim] on his arms, the cat r[a]n underneath his foot, tripped, fell down the steps onto [the victim], and he thought that she was okay." Additionally, Ms. Lane stated that she was still scared at the time of trial that she was "going to be charged" with something due to her giving the Defendant a ride.

Cherish Nicole Sylvis testified that the Defendant visited her home during the day on March 6, 2013, to see her boyfriend. Ms. Sylvis stated that she returned home from work at approximately 12:30 p.m., and when she saw the Defendant, she thought "he might have been messed up on drugs[,]" possibly cocaine.

Reba Iselin rented the Rocky Road mobile home to Ms. Tisdale. On one occasion, Ms. Iselin went inside the residence and saw two air mattresses on the floor.

D. Investigation by Law Enforcement. Surveillance footage covering the evening hours of March 6, 2013, was obtained from the Love's Travel Center off of I-40 at exit 163. On the recording, the Defendant could be seen inside the travel center purchasing a six-pack of beer and a pack of cigarettes at 10:48 p.m.

---

[3] The details of this conversation are not apparent from the transcript, and the recording is not included in the record.

Mike Breedlove testified that he was in his fifth month as Sheriff of Cheatham County and that, prior to that, he was a special agent criminal investigator with the TBI for thirty years.[4] Agent Breedlove was tasked with investigating the victim's death.

Agent Breedlove went to Ms. Perez's residence on March 7, 2013, where he saw "two dug out areas of" Ms. Perez's gravel driveway. Once inside the residence, Agent Breedlove saw the victim lying on the floor covered by a blanket. He removed the blanket and saw a reddish brown stain or substance inside the victim's ear and a number of bruises and marks all over the victim's body. Agent Breedlove explained that the victim had "quite a few injuries" "all over her body." According to Agent Breedlove, this was "one of the wors[t] blunt force injury deaths that [he had] worked in [his] career," and he "was very sure that given the injuries to the child that it wasn't accidental." He also opined that the victim's injuries were not consistent "with [someone] just falling on a child." Furthermore, Agent Breedlove testified that he was familiar with lividity and livor mortis, which involves the settling of blood post-mortem, and while some of that was present here, the settling of blood did not account for the victim's multiple bruises, in Agent Breedlove's opinion.

Later that evening, Agent Breedlove went to the Defendant's residence on Rocky Road to conduct a search. Agent Breedlove observed a reddish-brown stain or substance on the front steps, "a scuff mark or something" on one of the steps, and fibers of hair on the "floor mat on the porch." A plastic drinking straw with powdery residue was discovered in the Defendant's bedroom. Subsequent testing by the TBI revealed the presence of cocaine and human DNA on the straw that matched the Defendant's DNA profile. Also, Agent Breedlove observed a pair of matching children's socks inside the home—one sock was seen in the laundry area and the other behind a white rocker in the living room.

According to Agent Breedlove, the mobile home was in general disarray but "also there was evidence that there was some cleaning done." Agent Breedlove smelled "some kind of cleaning agents," and he saw a bucket with a mop and a cleaning agent inside. While Agent Breedlove did not see any trash inside the trash can, he did observe a reddish brown stain or substance therein. Moreover, there were no beer bottles or cigarettes found anywhere inside the residence despite evidence that the Defendant had purchased such items the night before. Agent Breedlove had also learned that the victim may have, on occasion, slept on an air mattress; this fact being corroborated by testimony from Ms. Gilbert and Ms. Iselin that they saw two air mattresses inside the home. However, Agent Breedlove did not find any air mattresses in the trailer.

---

[4] We will refer to this witness in his capacity as a TBI agent.

Agent Breedlove confirmed that the Defendant's home was in the southern part of Dickson County and that Ms. Perez's was at least fifteen to twenty minutes away. He further verified that TriStar Horizon Hospital was located only 1.66 miles from Ms. Perez's residence.

In addition, Agent Breedlove, along with Detective Kelly Owen of the Dickson Police Department, interviewed the Defendant about the circumstances surrounding the victim's death. A video recording of that interview was played for the jury. During the interview, the Defendant revealed that he knew the victim "was messed up bad" when she was injured; that he believed she needed to go to the hospital at that time, although he did not take her that evening due to his level of intoxication; and that, after the fall, he still went to the gas station to get cigarettes despite his claim that he "was too drunk to drive." The Defendant also said, "[A] little girl is dead, man, it's my fault . . . all my fault man . . . motherf--king fault . . . I wish I had been good, man, I was trying to keep them safe." Agent Breedlove agreed that the Defendant "was under quite a bit of distress" during the interview.

Agent Breedlove also photographed the Defendant following the Defendant's interview, taking pictures of the Defendant's forehead, right elbow, and right knee. Although Agent Breedlove saw some redness on the Defendant's knee and elbow, he did not observe any lacerations or cuts. Agent Breedlove asked the Defendant several times during the interview if he needed medical attention, and the Defendant always responded in the negative.

Finally, Agent Breedlove testified that the Defendant's truck was discovered abandoned in a K-Mart parking lot. Agent Breedlove did not see if the truck would start before having it towed. However, he did not recall the keys being in the truck, and "most importantly," he did not want anyone inside the truck until it was "processed."

D. Medical Testimony. Doctor Thomas Deering testified as an expert in forensic pathology. Dr. Deering performed the victim's autopsy on March 8, 2013, and prepared a report, which included a diagram of the victim's injuries. Dr. Deering determined that the victim's cause of death was homicide due to multiple blunt force injuries to the torso. He also found that multiple blunt force injuries to the victim's head were a contributing cause of death, noting that there "were way too many" to be the "result of a kid running around just doing normal things like falling."

Regarding the injuries to the victim's head, Dr. Deering stated that the victim had sustained multiple contusions or bruises to the left side of her forehead and face, and a small abrasion to her left nostril. She also had multiple large contusions on the back of her head. Dr. Deering described the bruises on the back of the victim's head as

"confluent," which meant that they "kind of grew together." Additionally, the victim had bruises "over each ear," multiple contusions to the right side of her face and head, multiple "superficial subgaleal hemorrhages," and some swelling on her brain.

Turning to the injuries to the victim's torso area, Dr. Deering explained that she had multiple bruises to her chest and back. There was a large bruise beginning on the left side of the victim's chest and going onto her back, and this "large area of bruising" was not a typical bruise, according to Dr. Deering. The victim's left posterior tenth rib was fractured, which was unusual for a child this age because children's ribs are "more elastic" than adults. The location of this rib fracture indicated inflicted trauma. The victim sustained "multiple deep lacerations" to her liver, and there was "a big collection of blood sitting on top of it." The victim had tears to her spleen and kidney. Dr. Deering found that two milliliters of blood had pooled in the victim's belly, which was "a lot" for a child the victim's age.

Dr. Deering testified about the "blunt traumas to [the victim's] extremities." He noted that she had bruises on the left knee, the right upper arm, and the left forearm. However, he did not "really make much out of those."

Dr. Deering explained that lividity was "the settling of blood after death." He stated that the deep purple caused by lividity was different than a bruise.

When asked if "[t]hese type of injuries in an infant at this age" would be painful, Dr. Deering responded, "Yes. I mean, they would be painful. The lacerations, the bleeding into the belly, certainly the rib fracture would be painful." Dr. Deering was also asked for his medical opinion about whether the victim could have survived had she received prompt medical treatment after being injured, and he agreed that it would have been the victim's "only opportunity to survive."

Dr. Deering explained that injuries of the kind sustained by the victim were most often accounted for by inflicted trauma, such as car wrecks or falls from one- or two-story buildings, because it took "a significant amount of force" to cause the victim's injuries. In Dr. Deering's opinion, the Defendant's version of events—that the Defendant was holding the victim in his arms when he tripped over a cat and fell down some stairs, falling on top of the victim—was "very unlikely." Furthermore, Dr. Deering stated, "This is non-accidental trauma or child abuse, particularly when you bring in the head trauma that can't be accounted for at all by a single fall."

E. Defense Proof. Mr. Edmonson was recalled and testified that he was not present with Mr. Rayburn at the Defendant's residence on the evening of March 6, 2013. According to Mr. Edmonson, the only time he was with Mr. Rayburn at the Defendant's residence that year was in January or February to watch the college football national

-11-

championship game. He did not see the Defendant hit the victim at any time while they watched the football game.

Jonathan Lane was called to the stand and denied ever being present at the Defendant's residence on the evening of March 6, 2013. Mr. Lane likewise testified that, earlier that year, he watched the college football national championship with Mr. Rayburn at the Defendant's residence and that he did not observe the Defendant strike the victim on that occasion.

F. Verdict and Sentencing. Following the conclusion of proof, the jury acquitted the Defendant of felony murder in the perpetration of aggravated child abuse and of aggravated child abuse. He was found guilty of voluntary manslaughter as a lesser-included offense of felony murder during the perpetration of aggravated child neglect and guilty as charged of aggravated child neglect. The trial court sentenced the Defendant as a Range I, standard offender to consecutive terms of twelve years for the aggravated child neglect conviction and six years for the voluntary manslaughter, resulting in an effective eighteen-year sentence. The Defendant appealed, and the case is now properly before this court.

ANALYSIS

On appeal, the Defendant presents the following issues for our review: (1) whether the trial court erred by refusing to grant the Defendant's motion to suppress; (2) whether the evidence was sufficient to support the Defendant's convictions; (3) whether the trial court abused its discretion when it admitted photographs taken at the crime scene and during the victim's autopsy; (4) whether the trial court erred by allowing a paramedic to testify as an expert about the "significance of the force" that caused the victim's injuries; (5) whether the trial court erred by allowing two witnesses to testify about the Defendant's alleged drug usage and drugs being found in his home; (6) whether John Rayburn's testimony should have been excluded because it bore "no indicia of reliability and was completely unverifiable"; (7) whether the trial court should have allowed the Defendant's "mitigation expert" to testify; and (8) whether the trial court erred when it allowed the State to play, as a prior inconsistent statement, the video recording of Judith Lane's police interview. We will address each in turn.

*I. Motion to Suppress*

The Defendant filed a motion to suppress on July 2, 2013, arguing that any statements made by him after he asserted his right to counsel were taken in violation of his constitutional rights and, therefore, inadmissible. The trial court agreed and entered an order to that effect. However, the Defendant later sought clarification regarding the

admissibility of the following exchange that took place at 11:38 a.m. while the Defendant was alone with Detective Owen, Agent Breedlove's having stepped out of the room:

> [The Defendant]: "Talk to a lawyer man."
> [Detective] Owen replied, "Do What?"
> [The Defendant] stated, "I said I need to talk to a lawyer . . . [a] little girl is dead, man, it's my fault . . . all my fault man . . . motherf--king fault . . . I wish I had been good, man, I was trying to keep them safe."
> [The Defendant] has his head in his lap, arms folded in.
> [The Defendant] then stated, "Being charged with murdering a kid . . . it's like my baby, it's like mine, was so close . . . she's pregnant with my baby . . . I killed her kid, I killed her kid man, she's pregnant with my baby! ([The Defendant's] crying) I can't believe she's dead, man, that's crazy, that can't be true, man . . . When Brody called me and told me she was dead."[5]

At the suppression hearing, Detective Owen explained why he posed the "Do What" question to the Defendant:

> [The Defendant] was talking during that, I was having a hard time understanding some of the things that [the Defendant] was saying, and [the Defendant] had paused for a while and I just heard a mumble. I thought I understood the word lawyer, so I asked [the Defendant] to repeat that to make sure.

Detective Owen affirmed that he was seeking clarification of the Defendant's statement, "Talk to a lawyer man." According to Detective Owen, he had no problem understanding the Defendant when the Defendant made the request for counsel a second time. Detective Owen stated that he did not cease the interview following this second request because he "was just letting [the Defendant] talk."

At the conclusion of the hearing, the trial court ruled that the challenged exchange between Detective Owen and the Defendant was admissible. In so concluding, the trial court made the following findings: that "the Defendant initially made a weak attempt to request an attorney, when he stated, 'Talk to a lawyer man.'"; that "[f]or clarification, Detective Owen stated, 'Do What?'"; and that "[t]he Defendant then made a clear attorney request by stating, "I said I need to talk to a lawyer[.]" The trial court then, relying in part on State v. Claybrook, 736 S.W.2d 95 (Tenn. 1987), ruled that the Defendant "basically bubbled forth" the narrative that followed "without any initiating from the police" despite the Defendant's clear request for an attorney.

---

[5] We quote this exchange verbatim from an investigative report prepared by Agent Breedlove.

On appeal, the Defendant challenges the trial court's decision in this regard, arguing that Detective Owen continued to question him after his unequivocal request for an attorney. According to the Defendant, "[T]here was no mistaking his intent when he first requested an attorney. Detective Owen, knowing the [Defendant] was in an emotional[ly] vulnerable and weary position, followed up [with] a 'Do what?' instead of immediately terminating the interrogation." Because, in the Defendant's opinion, Detective Owen should have ceased the interview rather than asking "Do What?" his response to Detective Owen's question should have been suppressed. Furthermore, the Defendant contends that he was prejudiced by admission of his response because "[i]t was highly incriminatory and inflammatory on its face and only served to inflame the passions of the jury against [him]."

The State preliminarily argues that the Defendant has waived this issue by failing to raise it in his motion for new trial. Tennessee Rule of Appellate Procedure 3(e) states that

> no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.

Accordingly, we agree with the State that the Defendant's suppression issue was not properly preserved for appellate review in accordance with Rule 3(e). The issue is, therefore, reviewable only for plain error.

The plain error doctrine states that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence

-14-

of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

Applying the aforementioned plain error requisites, we first address whether the record clearly establishes what occurred in the trial court. Neither the video recording nor the transcript of that recording are included in the record on appeal.[6] We are, therefore, unable to review the trial court's findings of fact as they relate to the video recording. For example, we cannot address the clarity of the Defendant's initial statement, "Talk to a lawyer man," or whether this was a "weak request" for counsel. However, we do have a copy of Agent Breedlove's investigative report summarizing the Defendant's interview, which we quoted above word for word. Moreover, the trial court cited the exact same exchange at the suppression hearing, stating that it came "pretty much" verbatim from the transcript of the video recording. Also, according to the trial court, the transcript of the interview was "pretty consistent" with the trial court's review of the recording. In addition, the trial court recited the exact same language from Agent Breedlove's report in its order ruling on the motion to suppress.

Regardless, without the recording, we can confidently conclude that no clear and unequivocal rule of law has been breached. The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." State v. Berry, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9); see also State v. Turner, 305 S.W.3d 508, 515 (Tenn. 2010). When a defendant is in custody and subject to interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. See Miranda v. Arizona, 384 U.S. 436 (1966). Encompassed within the federal and state constitutional provisions is the right to counsel. See id. at 444. "[A]fter a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Davis v. United States, 512 U.S. 452, 455 (1994).

The United States Supreme Court generally stated in Miranda that the right to counsel is invoked when an individual "indicates in any manner and at any stage of the

---

[6] We are apt to note that, at oral argument in this case, the State, addressing plain error review of the suppression issue, noted that the video recording was not included in the record on appeal. Judge McMullen asked defense counsel if he wished to respond to the State's argument, to which defense counsel replied, "No, I'll let it stand on the brief." We decline to supplement the record sua sponte. Moreover, we are able to decide without the recording that several of the other plain error requirements are not present.

-15-

process that he wishes to consult with an attorney before speaking[.]" 384 U.S. at 444-45. However, eight years later in Davis v. United States, the United States Supreme Court adopted a significantly narrower standard for invoking a right to counsel under the Fifth Amendment when it held that "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. 452, 458-59 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)).

"When a suspect invokes the right to counsel, police must cease questioning until counsel is present" or the suspect initiates further conversation with the police. State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003) (citing Miranda, 384 U.S. at 444-45; Edwards v. Arizona, 451 U.S. 477 (1981); State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994)). Once the suspect invokes his right to counsel, any later statement made by a defendant as a consequence of interrogation by police must be suppressed. Edwards, 451 U.S. at 487. On the other hand, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda, 384 U.S. at 478. "'Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.'" Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (quoting United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985)).

The issue of whether a suspect's request for an attorney was unequivocal is a mixed question of law and fact that is subject to de novo review. State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013) (citing State v. Turner, 305 S.W.3d 508, 514-15 (Tenn. 2010)).[7] In Davis, the Supreme Court stated that, although it is a good policy for law enforcement to clarify whether a suspect has actually asked for an attorney when the suspect's request is ambiguous, it "decline[d] to adopt a rule requiring officers to ask clarifying questions." Davis, 512 U.S. at 461. The Court explained, "If the suspect's

---

[7] Seemingly contradictory, in State v. Farmer, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996), this court stated that "[w]hether the suspect made an equivocal or unequivocal request for counsel is a question of fact." However, in Turner, our supreme court recognized the common practice of this court:

> In practice, however, our intermediate appellate court has more properly considered the issue as a mixed question of law and fact and has not afforded deference to the rulings of trial courts. This is consistent with the approach taken in other jurisdictions. In fact, we were unable to find any reported decisions from appellate courts outside of this state that have reviewed the nature of a request for counsel as purely a question of fact. See, e.g., People v. Porter, 878 N.E.2d 998, 999 (N.Y. 2007); State v. Dumas, 750 A.2d 420, 425 (R.I. 2000); Commonwealth v. Redmond, 568 S.E.2d 695, 697-98 (Va. 2002).

305 S.W.3d at 514.

statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62. Accord Saylor, 117 S.W.3d at 246 ("The standard for a valid invocation of the right to counsel is the same under both [a]rticle I, [s]ection 9 [of the Tennessee Constitution] and the Fifth Amendment.").

Here, no one disputes that the Defendant initially made a voluntary, knowing, and intelligent wavier of his rights to counsel and against self-incrimination prior to the interview with Detective Owen and Agent Breedlove. When a defendant in custody initially waives his right to counsel and insists that he later revoked that waiver, the defendant bears the burden of proving he revoked the waiver and clearly asserted his right to counsel. Turner, 305 S.W.3d at 519. At the suppression hearing, Detective Owen testified that he was having difficulty understanding the Defendant because he was mumbling. When he heard the Defendant say the word lawyer, he asked for clarification. The trial court, after viewing the video recording of the Defendant's interview, found that "the Defendant initially made a weak attempt to request an attorney, when he stated, 'Talk to a lawyer man'"; that "[f]or clarification, Det[ective] Owen stated, 'Do What?'"; and that "[t]he Defendant then made a clear attorney request by stating, "I said I need to talk to a lawyer[.]" The trial court obviously credited Detective Owen's testimony, and when reviewing a trial court's decision on a motion to suppress, we defer to its factual findings on the credibility of the witnesses. See State v. McCormick, 494 S.W.3d 673, 678 (Tenn. 2016) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Accordingly, it was good policy for Detective Owen to clarify whether the Defendant actually asked for an attorney when the Defendant's request was ambiguous, see Davis, 512 U.S. at 461, and the Defendant's unsolicited narrative in response was admissible, see Miranda, 384 U.S. at 478; Butzin, 886 F.2d at 1018.

Finally, we are not convinced that a substantial right of the accused was adversely affected or that consideration of the issue is necessary to do substantial justice. Even if we were to determine after a de novo review of the recording, see Turner, 305 S.W.3d at 514 (applying de novo review because the trial court's determination was based on video evidence included in the appellate record), that the challenged statements made by the Defendant should have been suppressed as a result of the Miranda violation, the error would still be subject to harmless error review, see Climer, 400 S.W.3d at 569. The erroneous admission of evidence obtained in violation of a defendant's Miranda rights is a non-structural constitutional error, see Climer, 400 S.W.3d at 569, and as such, the test is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Additionally, "[f]or a substantial right of the accused to have been affected, the error must have prejudiced the [defendant]. In other words, it must have affected the outcome of the trial court proceedings." State v. Armstrong, 256 S.W.3d 243, 250 (Tenn. Crim. App. 2008) (citations omitted). While the burden on the State is "quite stringent"

to prove a non-structural constitutional error was harmless under <u>Rodriguez</u>, <u>see</u> <u>Climer</u>, 400 S.W.3d at 569 (quotation omitted), a defendant bears the burden of persuasion in the plain error context, <u>see</u> <u>Armstrong</u>, 256 S.W.3d at 250 (citations omitted) (discussing the correlation between harmless error review under Tennessee Rule of Criminal Procedure 36(b) and the analysis of plain error factors).

In our opinion, the Defendant suffered no actual prejudice as the evidence presented against him was overwhelming, including the Defendant's own statements prior to his first "weak attempt" to request an attorney. The Defendant's unchallenged admissible statements included that he knew the victim "was messed up bad" when she was injured; that he believed she needed to go to the hospital at that time, although he did not take her that evening due to his level of intoxication; and that, after the fall, he still went to the gas station to buy cigarettes despite his claim that he "was too drunk to drive." Furthermore, despite the Defendant's awareness the next morning that the victim was crying and wheezing, he drove the victim to Ms. Perez's house and left abruptly. According to Ms. Perez, the victim was unresponsive upon arrival. Moreover, the jury was inclined to believe the defense theory to some degree, finding the Defendant not guilty of aggravated child abuse and guilty of the lesser-included offense of voluntary manslaughter. After an examination of the record, we conclude that the plain error doctrine can afford no relief to the Defendant on this issue.

## II. Sufficiency of the Evidence

The Defendant argues that the jury's verdict convicting him of aggravated child neglect and voluntary manslaughter was not supported by the weight of the evidence. An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u>; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise,

appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

### A. Aggravated Child Neglect

Regarding the Defendant's aggravated child neglect conviction, he submits that no reasonable trier of fact could conclude that the elements were established beyond a reasonable doubt, noting that he "did not realize that [the victim] was seriously injured at the time of her injury[,]" and that, "when [he] awoke on the morning of March 7, 2016, he took [the victim] to her maternal aunt's residence and asked Kim Perez to contact 9-1-1."

A person commits child neglect when that person "knowingly . . . neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare[.]" Tenn. Code Ann. § 39-15-401(b). As charged in the indictment and submitted to the jury in this case, "[a] person commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in § 39-15-401(b) . . . and . . . [t]he act of . . . neglect . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1).[8]

In short, child neglect is composed of three essential elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." State v. Sherman, 266 S.W.3d 395, 404 (Tenn. 2008). In order to establish neglect, the State must first show that a defendant owed a legal duty to the child. Id. A defendant may be subject to criminal liability for child neglect when the defendant stands in loco parentis to the child. Id. at 405. A person stands in loco parentis when that person assumes the full responsibilities of a parent. Id. at 406 (citing Norton v. Ailor, 124 Tenn. 563, 566 (1883) (stating that when a stepfather admits a child into his household, he assumes "the obligation of the father as respects the support of his minor child")).

---

[8] Normally, aggravated child neglect is a Class B felony. However, if the victim is eight years of age or less, aggravated child neglect is a Class A felony. See Tenn. Code Ann. § 39-15-402(b). Although the victim in this case was under the age of eight, the jury instructions provided only that the child must be eighteen years of age or less. In light of these instructions, the Defendant was punished as a Class B felon pursuant to an agreement by the parties.

Further, child neglect is a nature-of-conduct offense, not a result-of-conduct offense. State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000). The statute merely requires that the act of neglecting the child must be knowing. Id. By way of illustration, a defendant satisfies the mens rea for child neglect when he or she knowingly leaves a child in a car for more than eight hours, but the mens rea requirement is not satisfied if he or she was unaware the child was present in the car at the time. Id. After the knowing mens rea is established, then the next inquiry is whether the child suffered an adverse effect to the child's health or welfare. Id. If the child has suffered an adverse health effect as a result of defendant's knowing neglect, then the defendant has committed child neglect, regardless of whether the defendant knew what the result of the neglect would be. Id.

The proof, in the light most favorable to the State, established that the Defendant and the victim's mother were involved in a romantic relationship and that the Defendant became the primary caregiver for the victim and her three-year-old sister after their mother was incarcerated. The Defendant and the two children lived with the Defendant's sister, Shara Tisdale, in a mobile home on Rocky Road, and Ms. Tisdale helped the Defendant care for the children. Ms. Tisdale's boyfriend, Shannon Edmonson, was also a frequent overnight visitor to the mobile home. In addition to Mr. Edmonson, Ms. Tisdale had some guests over on the evening of March 6, 2013, to spend the night.

That evening, Ms. Tisdale gave the two girls a bath and got them dressed for bed. According to both Ms. Tisdale and Ms. Gilbert, when they left the Rocky Road residence that evening, the victim was alive and breathing and without any visible bruises. The Defendant was alone with the children after the group's departure.

John Rayburn testified that he lived next door to the Defendant and visited the Defendant on the evening on March 6, 2013. According to Mr. Rayburn, "a white man and a black man" were also there at that time. Mr. Rayburn testified that he observed the Defendant drinking beer and snorting cocaine. This testimony was corroborated by a statement Mr. Edmonson gave to the police, wherein he said that the Defendant had been drinking earlier that day and appeared "messed up," and Ms. Sylvis's testimony that she saw the Defendant around 12:30 p.m. on March 6, 2013, and "he might have been messed up on drugs[,]" possibly cocaine. Additionally, a plastic straw with cocaine residue and the Defendant's DNA profile was found in the Defendant's bedroom. Furthermore, Mr. Rayburn stated that, while he was at the Defendant's home, the victim lost one of her socks; the Defendant became angry and "hit [the victim] like a man" by striking her three times in the ribs, and then throwing her in a closet; and the Defendant said that he was tired of caring for the two girls while their mother was away. After witnessing the violence, Mr. Rayburn left the residence.

-20-

When the Defendant arrived at Kim Perez's home early the following morning, he woke Ms. Perez up and told her that the victim was sick and needed to be taken to the hospital. The Defendant brought the victim inside the home and handed her to Ms. Perez; however, according to Ms. Perez, the victim was already unresponsive and was not breathing at that time. She asked the Defendant why he did not call 9-1-1, and the Defendant replied that he was scared. The closest hospital was only 1.66 miles away from Ms. Perez's home. The Defendant quickly left the home after handing over the victim, and Ms. Perez could hear "gravel spinning everywhere" in the driveway as if the Defendant had driven away in a hurry. Ms. Perez dialed 9-1-1 and began performing infant CPR on the victim, receiving instructions from the operator. When Officer Hull, who was dispatched to Ms. Perez's home at 7:43 a.m. on March 7, 2013, arrived, he took over administering CPR. However, the victim never responded to resuscitative efforts and was ultimately pronounced dead at the scene.

While on the scene, both paramedic Bradley and Officer Hull observed significant bruising all over the victim's body. Dr. Deering, the medical examiner, later determined that the victim's cause of death was multiple blunt force injuries to the torso, with multiple blunt force injuries to the head as a contributing cause of death. In Dr. Deering's opinion, the victim's injuries were not consistent with the Defendant's version of events—that the Defendant was holding the victim in his arms when he tripped over a cat and fell down some stairs, falling on top of the victim. Furthermore, Dr. Deering testified that injuries of the kind sustained by the victim were accounted for by inflicted trauma, such as car wrecks or falls from a one- or two-story building, being the result of "a significant amount of force." According to Dr. Deering, the victim's "only opportunity to survive" would have been to receive prompt medical attention.

Also during the morning hours of March 7, 2013, Ms. Tisdale received several text messages from the Defendant. First, the Defendant said to "[c]all [him] now"; then, he wrote that "[t]he baby is hurt"; and next, he instructed, "pick up the phone, the baby is hurt bad." In his last message sent at 8:14 a.m., the Defendant said, "If anybody asks, I've not had the kids in two days, I've been with you." He also called Judith Lane that same morning sometime about 7:20 a.m. and asked her to come pick him up at a local Kroger; however, the Defendant had previously abandoned his car at a local K-Mart. He told Ms. Lane also that something was wrong with the victim. The Defendant was arrested later that day at Ms. Lane's home.

In the Defendant's subsequent statement to police, he said that the he took the victim and her sister with him to buy cigarettes on the evening of March 6, 2013, and it was then that he fell with the victim. He acknowledged that the victim was bruised during the fall and that he thought about taking her to the hospital at that time, but she appeared to be okay and he was "too drunk to drive." The victim woke up the next

morning wheezing, according to the Defendant, but he still did not take her to the hospital or call 9-1-1, instead taking her to Ms. Perez's residence.

Moreover, it appeared that the Rocky Road trailer, which was in general disarray, had been cleaned due to the strong odor of household cleaning products and the observation of a mop and bucket with a cleaning agent inside. Additionally, certain items, like the beer and cigarettes the Defendant purchased the night before, and the mattress the victim possibly slept on, were not located in the mobile home.

A defendant's mental state is a factual question for the jury to resolve. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010) (citations omitted). Additionally, "[o]ur jurisprudence recognizes that the mental state, a necessary factor of almost all our criminal statutes, is most often proven by circumstantial evidence, from which the trier of fact makes inferences from the attendant circumstances and from which that body weighs the circumstantial evidence." State v. Jeffrey Antwon Burns, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App. Oct. 13, 2000); see also State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000). Finally, as explained above, the State was not required to prove that the Defendant knew or should have known of the risk of harm posed by his conduct to any degree. See Ducker, 27 S.W.3d at 897. Child neglect is not a result-of-conduct offense, but it is instead a nature-of-conduct offense. Id.

The evidence, including the Defendant's statement to police and text messages to Ms. Tisdale, does not support the Defendant's assertion that he "did not realize that [the victim] was seriously injured at the time of her injury." Additionally, the Defendant appears to insinuate that because, "when [he] awoke on the morning of March 7, 2016, he took [the victim] to her maternal aunt's residence and asked Kim Perez to contact 9-1-1[,]" he did not neglect the victim's health and welfare. However, the hospital was only 1.66 miles away from Ms. Perez's residence, and the victim was already unresponsive by the time he brought her to Ms. Perez's home. Dr. Deering testified that the victim's "only opportunity to survive" would have been to receive prompt medical attention. Dr. Deering also stated that the victim would have experienced pain due to her injuries. Moreover, Mr. Rayburn testified that the victim cried when the Defendant hit her and that she cried the entire time he was there.

Based upon the proof outlined above, the jury could rationally infer that the Defendant acted knowingly when he failed to take the necessary steps to seek medical attention for the victim, and that this neglect adversely affected the victim's health and welfare, resulting in serious bodily injury, in this case, her death. We conclude that the evidence was sufficient to sustain the Defendant's conviction for aggravated child neglect. See, e.g., State v. Dwaniko Martez Sudberry, No. M2011-00432-CCA-R3-CD,

-22-

2012 WL 5544611, at * (Tenn. Crim. App. Nov. 14, 2012) (holding that the evidence was sufficient to support attempted aggravated child neglect conviction where the victim was observed alive and healthy before being "practically" left alone with the defendant; the defendant being aware of the victim's injuries, never summoned help or called 9-1-1 until others arrived at the home; and the assistant medical examiner testified that without medical treatment, the victim could have survived for a few hours, at most).

*B. Voluntary Manslaughter*

Turning to his conviction for voluntary manslaughter, the Defendant, citing State v. Brown, 836 S.W.2d 530, 554 (Tenn. 1992), submits that the evidence is insufficient to support this conviction because the eighteen-month-old victim could not commit an act that would amount to adequate provocation. The State first responds that the Defendant's argument relies on dicta from Brown, which it characterizes as "an old jury instruction case." The State then submits that the proof, in the light most favorable to it, shows that the Defendant "was provoked by the victim's act of losing one of her socks and, in John Rayburn's words, 'hit her like a man' by repeatedly striking her three times in the ribs, and throwing her in a closet." Finally, the State provides the following legal tenets in support of its argument: (1) "[T]he issue of what constitutes adequate provocation is a question of fact which must be decided under the particular facts of each case by the jury." (citing State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995)); and (2) "The statute requires 'adequate' provocation—there is no requirement that there is 'rational' provocation." (quoting State v. Khaliq Ra-El, No. W2013-01130-CCA-R3-CD, 2014 WL 3511038, at *5 (Tenn. Crim. App. July 11, 2014)).

Here, the Defendant was charged with first degree felony murder but convicted of voluntary manslaughter. Voluntary manslaughter is a lesser-included offense of felony murder under part (b) of the test promulgated by our supreme court in State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999). See State v. Devon Banks, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *32 (Tenn. Crim. App. July 6, 2007); State v. Marlon Marktavias Fitzgerald, No. W2001-03096-CCA-R3-CD, 2003 WL 261940, at *9 (Tenn. Crim. App. Feb. 7, 2003); State v. Alfonzo Williams, W2001-00452-CCA-R3-CD, 2002 WL 1482695, at *5 (Tenn. Crim. App. Mar. 15, 2002) (citing State v. Daniel Wade Wilson, No. E2000-01885-CCA-R3-CD, 2001 WL 872442, at *14 (Tenn. Crim. App. Aug. 2, 2001)). Moreover, our supreme court recently determined that the 2009 addition of subsections (f) and (g) to Tennessee Code Annotated section 40-18-110 did not abrogate part (b) of the Burns test and that part (b) continues to be applicable to

-23-

determining whether an offense is a lesser-included offense. State v. Howard, 504 S.W.3d 260, 270 (Tenn. 2016).[9]

If an offense is found to be a lesser-included offense, the court must next ascertain whether the evidence justifies a jury instruction on the lesser-included offense. State v. Bowles, 52 S.W.3d 69, 75 (Tenn. 2001). To do so, the court must first determine whether there is evidence that "reasonable minds" could accept to establish the lesser-included offense. Burns, 6 S.W.3d at 469. The court must view the evidence liberally in a light most favorable to the existence of the lesser-included offense without judging its credibility. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469. Finally, the court must determine if the evidence is "legally sufficient" to support a conviction for the lesser-included offense. Burns, 6 S.W.3d at 469.

Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). The elements which distinguish voluntary manslaughter from murder are those of "adequate provocation" and the "state of passion." It has long been held under Tennessee law, and at common law, that a murder will only be reduced to voluntary manslaughter when the provocation was caused by the victim. See State v. Tilson, 503 S.W.2d 921 (Tenn. 1974); State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *11 (Tenn. Crim. App. Mar. 9, 2011); State v. Antonius Harris, No. W2001-02617-CCA-R3-CD, 2002 WL 31654814 (Tenn. Crim. App. Nov. 7, 2002); State v. Khristian Love Spann, No. 1230, 1989 WL 86566, at *7 (Tenn. Crim. App. Aug. 3, 1989); see also Commonwealth v. LeClair, 840 N.E.2d 510 (Mass. 2006) (providing a history of the rule at common law and citing supporting cases from other jurisdictions); 40 C.J.S. Homicide § 114 (2010); 40 Am. Jur. 2d Homicide § 53 (2010).

The Tennessee Supreme Court first addressed this issue in Tilson, where the defendant in Tilson had been involved in a barroom brawl with several men prior to leaving the bar. 503 S.W.2d at 921-22. The defendant returned a short time later with a pistol and shot the victim who had taken no active part in the fight but had been "on the side" of the one provoking the fight. Id. at 923-24. Our supreme court held that the defendant's actions did not constitute voluntary manslaughter because he killed an

---

[9] "Subsection (f) effectively codified parts (a) and (c) of the Burns test." Howard, 504 S.W.3d at 269. Furthermore, subsection (g) was added to specify certain lesser-included offenses. See Tenn. Code Ann. § 40-18-110(g) (providing that second degree murder is a lesser-included offense of first degree murder, voluntary manslaughter is a lesser-included offense of first degree premeditated murder and second degree murder, aggravated sexual battery is a lesser-included offense of aggravated rape, and sexual battery and sexual battery by an authority figure are lesser-included offenses of rape and aggravated rape).

unarmed man who was simply "on the side" of the person who provoked an earlier fight with the defendant. Id. Similarly, in a more recent decision, this court held that there was insufficient evidence to support a defendant's claim of adequate provocation when the defendant had kidnapped several people and was shot by one of the victims before he "shot his unarmed victim whom he had been holding at gunpoint and who had done nothing to provoke the defendant." Harris, 2002 WL 31654814, at *12-13.

In the present matter, the jury found that the Defendant was adequately provoked by the eighteen-month-old victim's act of losing one of her socks. Despite its age, we agree with the principle espoused by our supreme court in Brown: "[I]t is a virtual legal impossibility for a small child to commit an act that would amount to provocation sufficient to make his subsequent death voluntary manslaughter rather than murder." 836 S.W.2d at 554. A child's losing of her sock certainly does not surmount this virtual legal impossibility. Accordingly, in this case, there was no evidence introduced that adequate provocation existed.

Previously in Tennessee, a conviction for the lesser-included offense of manslaughter in the absence of proof of passion did not require reversal "if the evidence demands a conviction of a higher degree of homicide than that found by the verdict, and there is either no evidence in support of acquittal of the greater crime, or if there is, the verdict of the jury clearly indicates that the evidence in support of acquittal was disbelieved." State v. Mellons, 557 S.W.2d 497, 499 (Tenn. 1977), overruled by State v. Parker, 350 S.W.3d 883, 909 (Tenn. 2011). The Mellons court noted that such a defendant suffered no prejudice. Id. at 499-500 (concluding, however, that defendant Mellons suffered prejudice because there was evidence the jury would have acquitted him of the greater crime and convicted him of involuntary manslaughter absent the instruction on voluntary manslaughter).

However, in 2011, the Tennessee Supreme Court overruled Mellons in State v. Parker, concluding that "[t]o sustain a conviction of a lesser-included offense, the proof must be sufficient to support each and every element of the conviction offense." 350 S.W.3d at 909. A reviewing court must examine each element of the offense of which the defendant stands convicted and determine if each element is supported by sufficient evidence. Id. "If the proof does not adequately support each and every element, the defendant is entitled to a reversal of the conviction." Id. This is true even if the evidence is sufficient to support a conviction for the greater offense. Id.; see also Brown, 836 S.W.2d 530, 553-54 (Tenn. 1992) (holding that trial court did not err in refusing to instruct the jury on voluntary manslaughter because it was essentially a legal impossibility for a small child's conduct to be adequate provocation). Cf. State v. Donald Knight, No. M2008-01023-CCA-R3-CD (Tenn. Crim. App. Aug. 17, 2009) (this court, prior to issuance of the Parker decision, affirming a voluntary manslaughter conviction

involving the death of a five-month-old child from "shaken baby" syndrome because the evidence was sufficient to support the greater offense charged, felony murder).

The record demonstrates there is proof sufficient to convict the Defendant of a greater degree of homicide but a complete absence of evidence regarding adequate provocation. The trial court's instructing the jury on voluntary manslaughter was plain error[10] because no rational trier of fact could have found that the infant's behavior, normal for a child her age, constituted "adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a); see State v. Elder, 982 S.W.2d 871, 878-79 (Tenn. Crim. App. 1998) (concluding that a rational trier of fact could not have found provocation or passion for a killing committed four and one-half hours after an argument regarding the victim selling drugs in the defendant's territory). Accordingly, under Parker, this conviction cannot stand, the evidence being insufficient to sustain it. See, e.g., State v. Alvin Waller, Jr., No. W2012-02591-CCA-R3-CD, 2014 WL 1168610, at *8-9 (Tenn. Crim. App. Mar. 21, 2014) (holding that Parker required reversal of attempted voluntary manslaughter conviction were there was no proof of adequate provocation and that it was error for the trial court to include as a lesser-included offense in the jury charge).

Nonetheless, when a jury convicts a defendant of a lesser-included offense, and this court later concludes that the convicted offense was not a properly charged lesser-included offense, this court can modify the convicted offense to the next properly-charged lesser-included offense that was supported by the evidence. See State v. Michael Dean Hodges, No. M2014-01544-CCA-R3-CD, 2017 WL 1416862, at *10 (Tenn. Crim. App. Apr. 19, 2017) (citation omitted); see also State v. Swift, 308 S.W.3d. 827, 831-32 (Tenn. 2010). The next properly-charged lesser-included offense that was supported by the evidence was reckless homicide, a Class D felony. See Tenn. Code Ann. § 39-13-215 ("Reckless homicide is a reckless killing of another."); see also Ely, 48 S.W.3d 720-22 (holding that reckless homicide is a lesser-included offense of felony murder).

The victim sustained her injuries on the March 6, 2013, while in the Defendant's care, and he never took her to receive medical treatment even after the severity of her

---

[10] It does not appear from the record before this court that the Defendant filed a written request, pursuant to Tennessee Code Annotated section 40-18-110(a)-(c), that the trial court instruct the jury on any lesser-included offenses. Moreover, when given the opportunity by the trial court, the Defendant failed to object to the instruction on voluntary manslaughter. Accordingly, the Defendant is entitled to relief only in the event of plain error. See State v. Fayne, 451 S.W.3d 362, 371 (Tenn. 2014) (citing State v. Page, 184 S.W.3d 223, 230 (Tenn. 2006)); see also Tenn. R. App. P. 36(b). To be entitled to plain error relief, the appellant has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008).

injuries were apparent. He, instead, dropped her off at her aunt's house the following morning, unresponsive and not breathing. Resuscitation efforts were unsuccessful, and the victim was pronounced dead on the scene. The evidence is more than sufficient to support a conviction for reckless homicide. See, e.g., State v. Randall T. Beaty, No. M2014-00130-CCA-R3-CD, 2016 WL 6600148, at *25-27 (Tenn. Crim. App. Nov. 8, 2106) (opinion on remand) (affirming reckless homicide conviction where the victim, who was left alone with the defendant, suffered "abusive head trauma" leading to her death and the "most likely mechanism . . . [was] some combination of shaking or impact of her head against a hard surface," and the defendant failed to seek prompt medical attention for the victim, who would not have acted normally after the injuries occurred), perm. app. denied (Tenn. Mar. 9, 2017). Thus, the Defendant's conviction of voluntary manslaughter must be modified to reckless homicide.

Because the trial court in this case imposed the maximum sentence for each of the Defendant's convictions, we need not remand this case for resentencing because the record before us is sufficient to impose an appropriate sentence. See State v. Zonge, 973 S.W.2d 250, 255 (Tenn. Crim. App. 1997). Using the trial court's previous sentencing determination as guidance, we impose the maximum sentence for this Class D felony, four years, consecutive with the sentence for aggravated child neglect, for an effective sentence of sixteen years' incarceration. See, e.g., State v. Daniel O'Sicky, No. E2010-02439-CCA-R3-CD, 2011 WL 3371486, at *7 (Tenn. Crim. App. Aug. 5, 2011) ("Accordingly, we impose a sentence of six years for the modified conviction because the trial court imposed the maximum sentence for each of the [d]efendant's other convictions."); State v. Jonathan Lee Adams, No. E2008-00400-CCA-R3-CD, 2009 WL 2176577, at *9 (Tenn. Crim. App. July 22, 2009) ("Given that the trial court imposed a minimum sentence of eight years for the defendant's especially aggravated burglary conviction, on remand we instruct the trial court to enter a three-year sentence for the defendant's aggravated burglary conviction."); State v. Larry Darnell Pinex, No. M2007-01211-CCA-R3-CD, 2008 WL 4853077, at *17 (Tenn. Crim. App. May 11, 2009) (imposing a modified mid-range sentence consistent with the trial court's other sentences). Accordingly, we remand for modification of the judgment form to reflect a conviction and sentence of four years for reckless homicide on count two.

*III. Autopsy and Crime Scene Photographs*

Prior to trial, the Defendant filed a motion to exclude "photographs of the deceased" victim taken during the autopsy and at the crime scene. Specifically, the Defendant contended that said photographs were "not relevant, and even assuming probative value[,]" were "gruesome in nature and serve[d] no other purpose but to inflame the jury." A hearing was held, where the trial court reviewed and ruled upon the

-27-

admissibility of twenty autopsy photographs and thirty photographs of the victim taken at the crime scene.

Regarding the autopsy pictures, the trial court found two of them to be inadmissible; and the remaining eighteen were subject to the State's laying the proper foundation for their admission. Several were also conditionally admissible upon the victim's eyes and genitalia being cropped out. Still others were conditionally admissible if the medical examiner explained "the residue on the [victim's] body left by the defibrillator adhesive pads" or the defibrillator electrodes were cropped out of the photograph. The trial court found that the probative value of the photographs was "strong . . . to show the injuries themselves and the severity and how they relate to the [victim's] cause of death." The trial court also concluded that the "very high" probative value of the photographs was not substantially outweighed by the danger of any unfair prejudice.

As for photographs of the victim taken at the crime scene, twelve were ruled inadmissible; one was ruled inadmissible to "be revisited later when the defibrillator electrodes" were cropped out; and seventeen were admissible if the State laid the proper foundation. Of those seventeen, six were conditionally admissible if "the electrodes of the defibrillator unit" were cropped out of the photograph. The trial court found the probative value of the photographs was "strong" and that their admission was not unfairly prejudicial except for those exhibiting the electrodes of the defibrillator unit placed on the victim.

Ultimately, during Dr. Deering's testimony, the State introduced fifteen autopsy photographs of the victim, a diagram prepared by Dr. Deering of the victim's body reflecting her injuries, and Dr. Deering's autopsy report. Prior to admitting the photographs, the trial court held a jury-out hearing, where Dr. Deering testified that the photographs "would be very helpful" in explaining the victim's injuries to the jury and that there was "no other way" to "clearly demonstrate the severity of her injuries," particularly due to the passage of time of some of the injuries.

For example, there were two autopsy photographs depicting a "liver hematoma," which Dr. Deering described as "a large collection of blood on the top of the [victim's] liver." According to Dr. Deering, these two pictures showed "that there was a period of time that passed between the injury and the hematoma" or, stated another way, that "the injury to the liver continued to bleed and form[ed] this hematoma . . . over time." Additionally, the pictures reflected the "degree of the [victim's] liver tear[,]" which Dr. Deering described as "a significant tear." Dr. Deering stated that he was going to give testimony regarding "how much force" it would take to cause the injuries to the victim's liver and spleen exhibited in the photographs. Dr. Deering provided another example,

stating that there was a photograph showing "a large bruise on the side of [the victim]," which picture would help explain the victim's fractured rib and injuries to the spleen. In conclusion, Dr. Deering expressed his belief that the photographs "would assist [him] in illustrating [his] testimony[.]" The trial court ruled that the autopsy photographs were admissible, assuming that Dr. Deering explained to the jury any visible residue left on the victim's body from the defibrillator adhesive pads seen in several of the photographs.

Concerning the crime scene photographs taken at Ms. Perez's residence, the State introduced ten pictures of the victim at trial. The first picture—a portion of the victim's body showing the electrodes and defibrillator pads attached—was presented during the testimony of paramedic Bradley. Referencing this photograph, Ms. Bradley explained that an AED had been placed on the victim in an attempt to resuscitate her. Eight of the remaining photographs were introduced during Agent Breedlove's testimony; one was of the victim's body covered by a blanket on Ms. Perez's floor, and the others were of the various bruises and marks on the victim's body as observed by Agent Breedlove at the scene. Agent Breedlove testified that, based upon his observations, the victim had "quite a few injuries" "all over her body." He opined that those injuries were not consistent "with [someone] just falling on a child." Later on recross examination, Agent Breedlove opined that this was "one of the wors[t] blunt force injury deaths that [he had] worked in [his] career." The last photograph—reflecting deep bruising to the victim's side—was introduced on the second redirect examination of Agent Breedlove. Although the defibrillator pad and electrodes could be seen, the trial court allowed this photograph, over objection, due to defense counsel's extensive questioning of Agent Breedlove about his conclusion that this was a homicide rather than an accident. At the same time the trial court allowed this final photograph, it affirmed its position that two other photographs were inadmissible despite the State's request to admit all three photographs for this same purpose.

On appeal, the Defendant contends that the trial court improperly admitted "the autopsy and/or crime scene" photographs of the victim. According to the Defendant, the probative value of said photographs was substantially outweighed by their danger of unfair prejudice because "the testimony alone of Dr. Deering was sufficient on its own without the need to shock the jury with gruesome photographs." He argues that he was prejudiced in this regard "as the jury was shown horrific photograph after photograph of the [victim]." The State responds that the trial court did not abuse its discretion in admitting the victim's autopsy photographs, noting that the nature and extent of the victim's injuries were at issue and that the Defendant's explanation for those injuries was that they were accidental. Moreover, the State explains that the "photographs were relevant to show the nature of the victim's injuries, to supplement Dr. Deering's medical testimony, and to support the State's argument that the [D]efendant's neglect resulted in

-29-

'serious bodily injury' to the victim." The State does not address the crime scene photographs of the victim's body.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. See State v. Banks, 594 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; Banks, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. Id. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. Id. at 949; see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

The Defendant does not raise a challenge to any specific photograph; his argument is cumulative in nature. He implies that all of the photographs, those taken at both the crime scene and during the autopsy, should have been excluded due to their "gruesome" nature.

Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. Banks, 564 S.W.2d at 951. Again, our supreme court has permitted "photographs of [a victim's body] . . . in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." State v. Adams, 405 S.W.3d 641, 658 (Tenn. 2013) (quoting Banks, 564 S.W.2d at 950-51). Moreover, this court has held that "photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." State v. Derek Williamson, M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)).

Here, the trial court took great care in reviewing each photograph individually. The trial court provided the following legal tenants in support of its conclusion that the various photographs were admissible: "[T]he photographs of the homicide victim were admitted to prove the number of bruises and wounds to aid testimony of the medical examiner." (citing State v. Barnard, 899 S.W.2d 617 (Tenn. Crim. App. 1994)); "Photographs of the homicide victim were admissible to supplement testimony of medical examiner." (citing State v. Bush, 942 S.W.2d 489 (Tenn. 1997)); "Photograph

-30-

more effectively portrayed true condition than could words of doctor." (citing State v. Branam, 604 S.W.2d 892 (Tenn. Crim. App. 1980); Withers v. State, 523 S.W.2d 364 (Tenn. Crim. App. 1975)); "Photographs established that wound was inflicted at point blank . . . range." (citing State v. Goad, 707 S.W.2d 846 (Tenn. 1986); State v. Brock, 678 S.W.2d 486 (Tenn. Crim. App. 1984)); "Photographs illustrate medical testimony in evidence of lay witnesses." (citing State v. Johnson, 743 S.W.2d 154 (Tenn. 1987)); and "Photos were unpleasant and gruesome but were highly relevant to show more force was used than confession indicated." (citing State v. Harbison, 704 S.W.2d 314 (Tenn. 1986)).

We agree with the trial court's well-reasoned conclusion. The autopsy photographs were highly probative of the nature and extent of the victim's injuries. The Defendant argued that the victim's death was accidental rather than the result of blunt force trauma, and the photographs assisted the jury in determining which version was true. Moreover, these photographs were offered to illustrate the medical examiner's testimony regarding the victim's various injuries. The pictures of the liver hematoma were particularly relevant to the act of neglect. The autopsy photographs entered as evidence were not so gruesome or overly graphic that their probative value was substantially outweighed by the danger of unfair prejudice.

Crime scene photographs of a victim tend to be prejudicial by nature, but this fact does not make them excludable per se. State v. Jordan, 325 S.W.3d 1, 86 (Tenn. 2010). This court has permitted "photographs of [a victim's body] . . . in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Banks, 564 S.W.2d at 950-51.

The trial court carefully considered the relevance and the possible prejudicial effect of each photograph at issue prior to overruling the Defendant's objections to their admission. The first crime scene photograph of the victim's body allowed paramedic Bradley to explain the presence of the defibrillator pad and electrodes on the victim's body. The next eight crime scene photographs of the victim were entered during the direct examination of Agent Breedlove as he described his observations of the victim on the scene. These photographs, which reflected the victim's covered body and only small bruises and marks on the victim's body once the body was uncovered, were not overly graphic. Furthermore, they served to illustrate Agent Breedlove's testimony and illuminate how he reached his conclusion that the victim's death was a homicide and not the result of "[someone] just falling on a child." In response to defense counsel's extensive questioning of Agent Breedlove about how he reached his conclusion that the victim's death was a homicide, the last photograph, although not previously admissible, was then allowed into evidence. While this final photograph was a more graphic depiction of the deep bruising on the victim's side and showed the defibrillator pad on the

-31-

victim's body, it gave additional meaning to Agent Breedlove's conclusion that the victim's death resulted from blunt force trauma, and it was not overly gruesome.

In summary, we conclude that the trial court cannot be said to have abused its discretion by admitting the various crime scene and autopsy photographs of the victim's body into evidence. We agree that the probative value of these photographs was not substantially outweighed by their danger of unfair prejudice. Accordingly, the Defendant is denied any relief on this issue.

### IV. Qualifying Paramedic Heather Bradley as an Expert

Next, the Defendant contends that the trial court erred by qualifying Heather Bradley as an expert. According to the Defendant, the trial court found that Ms. Bradley "did not have the requisite training to testify that the [victim's] injuries were blunt force trauma" but allowed her to "testify as to the significance of the force that caused the trauma." The Defendant opines that the difference between the two is only semantics and that, if Ms. Bradley "was unqualified to testify as to 'blunt force trauma[,]' then she would be unable to properly testify as to 'significant force' trauma as well." Finally, the Defendant submits that Ms. Bradley's testimony in this regard was inflammatory to his prejudice. However, according to the State's response, Ms. Bradley's "description of the victim's injuries reflected her experience and training as an EMT and a paramedic," and she was, therefore, "properly permitted to testify that the victim's injuries appeared to be the result of 'significant force.'" The State continues that Ms. Bradley's testimony was neither inflammatory nor prejudicial.

Ms. Bradley testified that, for the past five years, she had worked as a paramedic and that, prior to becoming a paramedic, she had twelve years' experience as an EMT. On the morning of March 7, 2013, Ms. Bradley responded to the call at Ms. Perez's residence of "a child who was not breathing." When Ms. Bradley arrived, the victim "was unresponsive, cold to the touch, apnea, [and] pulseless." Ms. Bradley also stated that she noticed multiple bruises on the victim's head, face, chest, back, legs, and arms. Ms. Bradley was then asked, "What did the injuries that [the victim] have indicate to you?" Defense counsel objected to this question, arguing that the question "[c]all[ed] for a conclusion" and that Ms. Bradley was "not qualified as an expert to give an opinion." An extensive jury-out hearing was held.

During the jury-out hearing, Ms. Bradley testified that she believed that the victim's injuries were caused by "blunt force trauma." She based this opinion upon her observations of the victim at the scene, particularly the multiple bruises and "the large bruise [she] saw on [the victim's] side." According to Ms. Bradley, "it was done with

significant force to appear to be so big or so dark in color." Ms. Bradley stated that this was the most extensive case of blunt force trauma she had seen.

Regarding her qualifications, Ms. Bradley said that she had been on "[h]undreds" of calls while working as both an EMT and a paramedic. According to Ms. Bradley, a paramedic gets "a little more involved in the diagnosis of what the condition is that's found on the scene" than an EMT does. Her training to become a paramedic lasted eighteen months. Ms. Bradley affirmed that, based upon her training and experience, she could differentiate between livor mortis and a bruise, and a bruise accompanied "some sort of injury" whereas livor mortis was "just a natural settling of blood."

The State argued that Ms. Bradley was not being offered as an expert but as lay witness to testify "based on her knowledge and experience as to the extent of injuries this child had and based her observation." Defense counsel replied, "He's soliciting an answer on causation[,] . . . [which] requires expert testimony." The State further submitted that "it was important to kind of go down this road to begin with" because defense counsel "started questioning Officer Hull as if he was an expert in lividity and livor mortis during his testimony."

The trial court considered the proffered testimony under Tennessee Rule of Evidence 702, which governs expert testimony, and the standards for admissibility of expert testimony set forth in McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997) and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Analyzing these criteria, the trial court ruled,

> What the [c]ourt is going to do in this case is allow the witness to—I don't believe that the witness has enough knowledge and expertise to qualify to say that it was blunt force trauma but she can say that it was significant force, I believe she can say that, and the [c]ourt will allow her to testify about the lividity issue because it was sufficiently opened in Officer Hull's testimony the [c]ourt believes.

The trial court then discussed admission of a photograph that State sought to admit on "this issue of bruising and lividity." While discussing this photograph, the trial court stated, "The witness is deemed an expert to the extent of what I've allowed to come in." Defense counsel then said, "I have some other pictures of other livor mortis and bruises that I would like her to pick out which is what on from other third parties if she is now an expert on liver mortis and bruising." Ultimately, the trial court did not allow the State to introduce the photograph into evidence during Ms. Bradley's testimony, affirming its

-33-

earlier conclusion that the probative value was substantially outweighed by the danger of unfair prejudice due to "the tubes running form the body."[11]

The State then asked Ms. Bradley if she had ever "seen a child more seriously bruised than" the victim, and she said, "No." Defense counsel argued that this testimony was not relevant. The trial court determined that the State could ask Ms. Bradley "was it very severe bruising" but could not ask her to compare the victim's injuries to other cases. The trial court summarized, "[S]he can testify that it was significant force, not blunt force."

Next, the State argued that "blunt force trauma" was "a term of art" that paramedics use in certain circumstances when reporting to an emergency room physician and that Ms. Bradley was not giving an expert opinion. The trial court ruled, "[I]f you ask it the way you did where if she were on the way—in describing it to a doctor, that's how she would have described it, I think that's fine."

When the jury returned to the courtroom, direct examination continued. Ms. Bradley explained that an AED had been placed on the victim in an attempt to resuscitate her; however, "[n]o shock was advised" because no heartbeat was detected. According to Ms. Bradley, the victim showed "no signs consistent with life" and was pronounced dead on the scene. Thereafter, Ms. Bradley testified as follows:

> Q. Okay. If you had found signs of life based on the injuries that you found on that day and you had transported her to the emergency room, would you have called ahead and told the doctors what sort of injuries you observed?
> . . . .
> Q. If you—did you report to a doctor what sort of injuries of injuries you observed?
> A. In this case?
> Q. Yes.
> A. I did not.
> Q. Why?
> A. My partner did.
> Q. Okay. If you had been doing that, what would you have reported?
> . . . .
> A. That she was not breathing, there was no pulse, and the bruising and discoloration that appeared to be on her body.

---

[11] This is the photograph discussed in the section above that was deemed admissible during the redirect examination of Agent Breedlove.

Q. What about that bruising?
A. That it appeared to be significant.

This is the only testimony from Ms. Bradley using the word significant. Direct examination was concluded, and defense counsel chose not to cross-examine Ms. Bradley.

Unless qualified as experts, witnesses may only offer opinions or inferences which are both "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." This court has held that "lay opinion testimony under Rule 701 is limited to those observations of a lay witness that are not based on scientific, technical, or other specialized knowledge which would qualify the witness as an expert under Rule 702." State v. Timothy Murrell, No. W2001-02279-CCA-R3-CD, 2003 WL 21644591, at *6 (Tenn. Crim. App. July 2, 2003) (citing United States v. Conn, 297 F.3d 548, 553 (7th Cir. 2002)).

First, after our review of the colloquy, and placing the entire discussion into context, we do not believe that the trial court ever qualified Ms. Bradley as an expert witness on any topic despite its statement that "[t]he witness is deemed an expert to the extent of what I've allowed to come in." Regardless, while the jury-out hearing, in large part, discussed whether Ms. Bradley could testify to "significant force" or "blunt force trauma" as the cause of the victim's injuries, she never testified to either in front of the jury. Instead, she simply described the bruising on the victim's body as significant. This testimony was not expert testimony, but opinion testimony by a lay witness that satisfied the requirements of Tennessee Rule of Evidence 701. Ms. Bradley's conclusion was based upon what she saw at the scene and could have been made by anyone with her experience.

Moreover, Officer Hull and Agent Breedlove also explained for the jury their observations of the victim's injuries. In fact, it was defense counsel that solicited Agent Breedlove's opinion that this was "one of the wors[t] blunt force injury deaths that [he] had] worked in [his] career." Also, as the trial court noted, defense counsel asked Officer Hull about the difference between bruising and livor mortis on cross-examination, opening the door to testimony on "the lividity issue." Finally, Dr. Deering offered his expert opinion that the victim's injuries resulted "a significant amount of force." In sum, the Defendant is not entitled to any relief from this issue.

-35-

*V. Testimony about the Defendant's Drug Use and Drugs in Home*

The Defendant challenges testimony from both Shara Tisdale and Shannon Edmonson concerning the Defendant's "alleged drug use and/or drugs found at [his] home," arguing that such testimony was not relevant. But then assuming arguendo that it the testimony was relevant, he contends that any testimony in this regard was outweighed by the danger of unfair prejudice, "creat[ing] an inflammatory impression with the jury that [h]e was a drug user and/or drug dealer." The State first notes that both Ms. Tisdale and Mr. Edmonson denied ever seeing the Defendant use drugs, that the only testimony about the Defendant being a drug user came from John Rayburn, and that there was never any testimony about the Defendant being a drug dealer. The State then submits,

> Because a drinking straw containing a powdery residue was found in the trailer the morning of [the victim's] death and the [D]efendant was seen snorting cocaine the night before by the only witness who saw the [D]efendant strike [the victim], the trial court properly permitted the State to question both witnesses about the [D]efendant's use of illegal drugs.

Preliminarily, we noted that a determination regarding the relevancy of evidence "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). Admissible proof must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401, which defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 adds that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)).

At trial, Ms. Tisdale testified that, when she left the Rocky Road residence on the evening of March 6, 2013, the Defendant "was in a good mood" and "was up and playing with the kids." Ms. Tisdale did not see the Defendant drinking or using any drugs that

evening. She further averred that she had not seen the Defendant use drugs at any time in the prior month.

Defense counsel then raised a relevancy objection to any questioning about the Defendant's drug use, arguing that testimony on the subject would serve only to confuse the jury and allow them to "draw some inference that's not there." The State contended that the evidence was admissible to show that the Defendant failed to seek prompt medical treatment for the victim because he was under influence and "afraid he was going to get in trouble." Applying the standards set forth in Tennessee Rules of Evidence 401 and 403,[12] the trial court first determined that "this line of questioning" about whether Ms. Tisdale "knew about the cocaine residue or whether she knew there [were] drugs in her house" was relevant. The trial court then concluded that the probative value of the evidence was "very high as far as identity and ownership of the drug and the State's theory of the case . . . regarding him being under the influence" and that the probative value was not substantially outweighed by the danger of unfair prejudice.

Direct examination of Ms. Tisdale resumed, and according to Ms. Tisdale, she did not keep any drugs or drug paraphernalia inside the residence. On recross examination, Ms. Tisdale stated that, when she spoke with the Defendant early the following morning, there was no indication to her that the Defendant was drunk or that he had been drinking to excess.

Similarly, Mr. Edmonson testified that he did not see the Defendant use cocaine on the evening of March 6, 2013, and that he did see any cocaine in the Rocky Road residence that evening. Mr. Edmonson further testified that it would surprise him to know that a straw with cocaine residue was found inside the home. The trial court sustained defense counsel's relevancy objection to the question of Mr. Edmonson, "Has there ever been any cocaine used at that house?" This was the only objection made by defense counsel during this line of questioning by the State. See Tenn. R. Evid. 103 (stating that a timely objection "stating the specific ground of objection" is necessary to preserve claim of erroneous admission of evidence). Also, no objection was lodged when Ms. Gilbert said that she had likewise not observed the Defendant use cocaine that evening.

Possible waiver notwithstanding, we agree with the State that neither witnesses' testimony directly implicated the Defendant as a drug user or a drug dealer. To the

---

[12] As the State correctly points out, the Defendant did not raise any objection to the testimony pursuant to Tennessee Rule of Evidence 404(b) that the proffered testimony amounted to improper character evidence. However, the trial court noted that this was "really more of a 404(b) issue" and examined the testimony under that rule as well, finding that the evidence was admissible under Rule 404(b)'s criteria.

-37-

contrary, both Ms. Tisdale and Mr. Edmonson testified to not seeing the Defendant use any cocaine that evening and were unaware of any being present in the residence. Ms. Tisdale further testified that she was unaware of any drug use by the Defendant in the preceding month. John Rayburn was the only witness to testify to the Defendant's using cocaine on the evening of March 6, 2013. Additionally, cocaine residue was found on a straw inside the home, and the Defendant's DNA was present on that straw. We agree with the trial court that the testimony was relevant and that its probative value was not substantially outweighed by its danger of unfair prejudice. The Defendant's usage of drugs that evening was critical to the State's case, particularly as it related to the child neglect offense, due to the Defendant's failure to seek prompt medical attention for fear of reprisal. We note that this line of questioning also served to impeach the credibility of Ms. Tisdale and Mr. Edmonson to some extent. Accordingly, there was no abuse of discretion when the trial court allowed the State to ask Ms. Tisdale and Mr. Edmonson about the Defendant's cocaine use that evening or whether they observed any cocaine inside the home.

### VI. Reliability of John Rayburn's Testimony

The Defendant submits that the trial court erred by allowing John Rayburn to testify because his "testimony contained no indicia of reliability and was completely unverifiable." The Defendant points to the facts that Mr. Rayburn was "the sole person" to contend that the Defendant "had a violent disposition prior to March 7, 2013"; that Mr. Rayburn's testimony lacked credibility because he admittedly never contacted law enforcement after seeing the victim get punched repeatedly; and that Mr. Rayburn's credibility was impeached when Shannon Edmonson testified that Mr. Rayburn was not present at the Rocky Road residence on the evening of March 6, 2013. The State responds that Mr. Rayburn's testimony about the Defendant "was not only reliable but corroborated by the medical examiner who performed [the victim's] autopsy." Additionally, the State asserts, "[T]he fact that Mr. Rayburn's testimony may have been inconsistent with the testimony of other witnesses does not render the trial court's decision erroneous."

In his appellate brief, the Defendant, other than a citation to the standard of review governing the admissibility of evidence, has failed to cite to any case law, statute, or rule in support of his claim that Mr. Rayburn's testimony should have been disallowed. See Tenn. R. App. P. 27(a)(7) (requiring an appellant's brief to include an argument that includes "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[.]") (emphasis added); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as

-38-

waived in this court.") (emphasis added). Accordingly, this issue is waived due to the Defendant's failure to cite supporting authorities.

Regardless, the trial court conducted an extensive jury-out hearing on this subject, where the State made a proffer of Mr. Rayburn's entire testimony, and the trial court also asked Mr. Rayburn some questions. At the conclusion of the jury-out hearing, defense counsel stated, in addition to other arguments, "And, you know, at this point I would make a 104 rule.[13] I don't think his testimony is reliable. It has to be reliable." Ultimately, the trial court determined that Mr. Rayburn could testify that he saw the Defendant hit the victim in the ribs three times before throwing her in the closet and that he saw the Defendant drinking beer and snorting cocaine that night. In addition to the things Mr. Rayburn could testify to, the trial court ruled that, pursuant to Tennessee Rule of Evidence 404(b), Mr. Rayburn could not testify about observing the Defendant's weighing cocaine or using marijuana that evening or about seeing the other men present snorting cocaine when Mr. Rayburn entered the residence. Also, Mr. Rayburn was forbidden from testifying that he met the Defendant in jail, instead to state only that he and the Defendant were neighbors, and the State was not permitted to ask Mr. Rayburn about his statement to Agent Breedlove that the Defendant "always had coke there." The trial court thereafter carefully reviewed and explained its ruling to Mr. Rayburn before allowing him to testify.

Mr. Rayburn's testimony supported the State's theory that the Defendant abused the victim on the evening of March 6, 2013, leading to her death. Dr. Deering testified that the victim's cause of death was blunt force injuries to her torso, with contributing injuries to her head. Also, the testimony concerning the Defendant's using cocaine that evening was corroborated by the forensic evidence. Nothing about Mr. Rayburn's testimony rendered it so inherently unreliable as to warrant complete suppression of his testimony. The Defendant cannot have evidence excluded simply because it casts him in a bad light with the jury. Witness credibility is an issue for the jury. See Bland, 958 S.W.2d at 659. The trial court did not abuse its discretion in allowing Mr. Rayburn's testimony as abridged, and the Defendant is not entitled to relief in this regard.

*VII. Denial of Testimony from "Mitigation Specialist"*

According to the Defendant, he had a constitutional right to call Rebecca Barnett in his defense for her to relay the Defendant's version of events that he fell on the victim.

---

[13] We can only presume that the Defendant meant Rule 104 of the Tennessee Rules of Evidence, which governs questions of admissibility generally. Rule 104 states, "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court[.]"

The Defendant, citing to the factors outlined in State v. Flood, 219 S.W.3d 307, 316 (Tenn. 2007), argues (1) that Ms. Barnett's testimony was "critical to his defense" because it "would have directly impacted the credibility of John Rayburn's testimony that the [Defendant] injured the [victim] by striking her"; (2) that her testimony bore "sufficient indicia of reliability" being "the same testimony that the [Defendant] ha[d] maintained throughout the pendency [of] the case at bar, to wit: the injuries to [the victim] were completely accidental and caused by the [Defendant's] tripping over a cat and then subsequently falling down a flight of stairs onto [the victim]"; and (3) that the interest supporting exclusion of Ms. Barnett's testimony was outweighed by its importance to the Defendant's defense. The Defendant also notes that, if the State had called Ms. Barnett to testify, her testimony would have been admissible "through the hearsay exception for party [opponent] admission"; thus, he ostensibly presents a "good-for-the-goose-good-for-the-gander" argument. The State responds that trial court properly denied the Defendant's request to call Ms. Barnett as a witness because Ms. Barnett's "proffered testimony was an attempt by the [D]efendant to introduce self-serving statements about [the victim's] injuries without testifying" and that exclusion of her testimony did not violate the Defendant's right to present a defense.

The United States Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)); see also Chambers v. Mississippi, 410 U.S. 284, 294 (1973). The Tennessee Supreme Court also has recognized that the right to present a defense is "a fundamental element of due process of law." State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting Washington v. Texas, 388 U.S. 14, 19 (1967)).

The right to offer testimony of witnesses, however, is not absolute. Flood, 219 at 316. "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." Id. (quoting Chambers 410 U.S. at 302) (internal quotation marks omitted). Our supreme court has recognized that "[r]ules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process" and that, "[s]o long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." Id. (citations omitted). As a result, a trial court's rulings regarding the admissibility of evidence, generally, do not rise to the level of constitutional error. State v. Rice, 184 S.W.3d 646, 673 (Tenn. 2004). However, "the erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error." State v. Bell, 512 S.W.3d 167, (Tenn. 2015) (citing Rice, 184 S.W.3d at 673). In determining whether the trial court's erroneous exclusion of evidence violated a defendant's constitutional right to present a defense, this court must consider: "(1) [w]hether the excluded proof is critical to the defense; (2)

-40-

[w]hether it bears sufficient indicia of reliability; and (3) [w]hether the interest supporting exclusion of the proof is substantially important." Flood, 219 at 316 (citing Brown, 29 S.W.3d at 434-35; Rice, 184 S.W.3d at 673; State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

Additionally, Tennessee has long recognized a "good-for-the-goose, good-for-the-gander" rule. Spadafina v. State, 77 S.W.3d 198, 213 (Tenn. Crim. App. 2000) (quoting Thomas v. State, 113 S.W. 1041, 1042 (Tenn. 1908)); see also Garrison v. State, 40 S.W.2d 1009, 1013 (Tenn. 1931)). The rule is that, "if a party opens the door for the admission of incompetent evidence, he is in no plight to complain that his adversary followed through the door thus opened; and this, although no objection was made in the first instance to the admission of such evidence." Spadafina, 77 S.W.3d at 213 (quoting Thomas, 113 S.W. at 1042) (internal quotation marks omitted).

During a jury-out hearing, Ms. Barnett testified that she was employed with a private investigation firm and that she worked on the Defendant's case "as a mitigation specialist." During her investigation, she interviewed the Defendant around the end of August or the first of September 2014. According to Ms. Barnett, the Defendant demonstrated for her how he fell on the victim:

> [The Defendant] stood and said he held [the victim] with his right hand—right arm, he had the diaper bag on his left arm. And when he went out the door, it was—she was low on his hip. And then as he approached to the steps, he tripped over a cat and he held her close with his right arm to his chest so she wouldn't fall out of his arm, and he fell head first down the stairs.
>
> . . . .
>
> He landed—he landed head first and it kind of knocked him—it didn't knock him out—it knocked the breathe out of him so that he was out for a minute, for just a second, and then when he—his face was on the brick at the bottom of the steps.

She also stated that the Defendant informed her that, when he fell on the victim, the victim "was under his body completely."

Defense counsel, citing Chambers v. Mississippi, argued that the Defendant's right to present a defense should trump the hearsay rule in this instance. Defense counsel further argued that "what's good for the goose is good for the gander" reasoning: "They've based their whole case on testimony that [the Defendant] said, and that [the Defendant] is a party to the action, thus . . . [Ms. Barnett's testimony] would be admissible." The State argued that Ms. Barnett's testimony was inadmissible hearsay.

-41-

Citing State v. Turnmire, 762 S.W.2d 893 (Tenn. Crim. App. 1998), the trial court ruled that the Defendant's statements were inadmissible hearsay because they "were self-serving and did not qualify as an admission since they were not used by the opposing party."[14] The trial court further determined that Chambers was distinguishable on its facts. 410 U.S. at 302 (concluding that the exclusion of the hearsay testimony that another person had confessed to the crime, which was critical to Chambers' defense, coupled with the State's refusal to allow defense counsel to cross-examine that person regarding the repudiation of his confession, denied Chambers "a trial in accord with traditional and fundamental standards of due process").

We agree with the trial court that the evidence the Defendant sought to introduce in this case falls far short of the critical evidence considered in Chambers. The trial court's ruling did not preclude the Defendant from presenting a defense that he tripped over a cat on the stairs and fell on the victim, thus, causing her injuries. The jury heard proof of such from Kimberly Perez, Judith Lane, and the Defendant himself through the video recording of his interview with Agent Breedlove and Detective Owen.

In his interview with Agent Breedlove and Detective Owen, the Defendant stated that, when he went to buy cigarettes on March 6, 2013, he "was walking out on the porch man, and . . . tripped over the cat and . . . fell" on the ground while holding the victim, and that he was holding the victim in his arms and "had the diaper bag on [his] other shoulder" when he fell. Ms. Perez testified that the Defendant told her "that he tripped and fell on top of [the victim] the night before[.]" Ms. Lane also relayed the Defendant's version of events: "[H]e was coming down the steps to go to the store. He had [the victim] on his arms, the cat r[a]n underneath his foot, tripped, fell down the steps onto [the victim], and he thought that she was okay." The Defendant "was not totally foreclosed from presenting the proffered evidence by the Tennessee Rules of Evidence." See Flood, 219 S.W.3d at 318.

Moreover, the testimony from Agent Breedlove, Ms. Lane, and Ms. Perez was more than sufficient to "directly impact[] the credibility of John Rayburn's testimony that the [Defendant] injured the [victim] by striking her." Mr. Rayburn's credibility was also seriously assailed by Jonathan Lane's and Shannon Edmonson's testimony that they were not present inside the Defendant's residence with Mr. Rayburn that evening, as Mr. Rayburn claimed. And once again, the jury was inclined to believe the defense theory to some degree, finding the Defendant not guilty of aggravated child abuse and guilty of the lesser-included offense of voluntary manslaughter. Accordingly, we conclude that the

---

[14] The trial court also found that the statements were not admissible under the past recollection recorded exception to the hearsay rule.

-42-

proffered evidence was not critical to the Defendant's defense such that the trial court's exclusion of the evidence violated his right to present a defense.

Furthermore, this is not a situation where that State opened the door for the admission of incompetent evidence. The State did not introduce any improper hearsay evidence on this subject during its case-in-chief, and the Defendant sought only to bolster his claim that the victim's injuries were accidental by Ms. Barnett's testimony. The "good-for-the-goose-good-for the gander" rule is not applicable under these facts.

### VIII. Video Recording of Judith Lane's Prior Interview

Lastly, the Defendant contends that the trial court erred in allowing the State to play Judith Lane's TBI interview recording as a prior inconsistent statement and that the recording "contained content that inflamed the passions of the jury" to his prejudice. First, citing Tennessee Rule of Evidence 613, he submits that the recording was not inconsistent with Ms. Lane's trial testimony. Next, he argues that his "Confrontation Clause rights were violated in that former Dickson County Sheriff's Detective Stacey Patterson was involved in the recorded TBI interview," and he was unable to cross-examine her. Finally, he avers that the trial court erred "in allowing a statement made by TBI Agent Breedlove to Judith Lane where he essentially stated that parents or step-parents were usually involved in infants deaths." The States responds that, because the recording is not a part of the appellate record, the trial court's ruling on all claims is presumptively correct. After that, the State notes that (1) "the available record" shows that Ms. Lane admitted, after listening to the recording of her prior statement, that it was not consistent with her earlier trial testimony and (2) that the trial court found that Detective Patterson's statements did not implicate the Confrontation Clause.

At trial, Ms. Lane testified, on direct examination, that she was contacted by the Defendant for a ride on the morning of March 7, 2013, "[b]etween 7:00 and 7:30, like 7:20 something maybe." She confirmed that she gave a statement to TBI Agent Breedlove but agreed that she was reluctant to speak at first because they were threatening to "press charges against [her]" as "an accessory after the fact." When asked by the prosecutor if she recalled telling Agent Breedlove that she "received a text from [the Defendant] at 7:42 a.m." on March 7, 2013, Ms. Lane did not "remember the exact time" but noted that she "surrender[ed] [her] phone to the detectives." The prosecutor then said, "In fact, I think it was 7:20 a.m.," and asked Ms. Lane if she would like to see her statement to Agent Breedlove to refresh her memory. Although she still could not recall the precise time she received the call[15] from the Defendant asking for a ride, she

---

[15] During this colloquy, the communication between Ms. Lane and the Defendant was referred to as both a text message and a phone call.

was certain that she received that call on her way to drop her children off at school and "believe[d]" it was approximately 7:20 a.m. Furthermore, she testified that she did not discuss with the Defendant whether he should have sought medical care for the victim before picking him up that morning; however, the prosecutor noted that was not consistent with the statement she gave to Agent Breedlove.

On cross-examination, Ms. Lane stated that she "[w]ould not have any problem leaving [her] children with [the Defendant]" and that the Defendant had in fact cared for her children before. Afterward, on redirect, the prosecutor confirmed this previous statement that she "wouldn't have any problem having [her] children with [the Defendant]" before asking Ms. Lane, "Then why did you tell the TBI agent that [the Defendant] had never had the kids, not for five seconds?" Ms. Lane denied making this statement to Agent Breedlove. But when she was shown her statement again, she said,

> Oh, I'm sorry. This says that I concluded that [the Defendant] had never had the kids, not for five seconds. And it also says that not because I didn't think he could take care of them, but—and not that I didn't think he was incapable of showing compassion and love for them, but just because it was a bad situation and you don't take care of kids that are not yours.

On recross examination, defense counsel asked Ms. Lane if she was threatened during the interview with the TBI, and she said, "I don't know. . . . I was scared I was going to go to jail." She further stated,

> They didn't direct me in my statements, . . . but they tried to tell me that I was covering for [the Defendant]. At one point they told me that I was there, that I snuck out of my house and snuck to his house and I was there and I'm a witness and that I—every time he gets in trouble, that I run and I rescue him[.]

Ms. Lane further averred that Agent Breedlove and a "blonde-headed detective"[16] were "making up lies to try to get [her] to say things[,]" that "they were telling [her] their story and then wanting [her] to make statements" to that effect, and that "[t]hey already had their theory and . . . wanted [her] to write it down for them[.]" According to Ms. Lane, Agent Breedlove and Detective Patterson "pretty much just told [her] that [the Defendant] was on drugs and out of his mind and he beat [the victim] to death," but Ms. Lane told them that was not true.

---

[16] We discern that this was a reference to Detective Patterson.

The State then sought to introduce the March 14, 2013 video recording of Ms. Lane's interview with Agent Breedlove and Detective Patterson. At the jury-out hearing that followed, the State argued that defense counsel had opened the door to the recording by going into "all the lies the TBI were telling [Ms. Lane], how they had their theory of the case, how they threatened her and cajoled her and she gave this statement under duress[.]" Upon request from defense counsel, the State pointed out what was inconsistent in the recording with Ms. Lane's trial testimony, noting (1) that Ms. Lane asserted that she had been berated, threatened, and lied to during the interview; (2) that "most of [Ms. Lane's trial] testimony was inconsistent with the statement she gave to" Agent Breedlove and Detective Patterson; and (3) that Ms. Lane was unable to recall the exact time the Defendant contacted her for a ride on the morning of March 7, 2013.

Defense counsel cited as reasons for exclusion of the recording the rules of relevance and the rule of completeness[17] and submitted that the recording was not inconsistent with Ms. Lane's trial testimony. Defense counsel further argued that Detective Patterson's statements on the tape violated the Confrontation Clause because he was unable to cross-examine her. Responding to the confrontation issue, the State contended that Detective Patterson's statements were not accusations against the Defendant but merely questions posed to Ms. Lane during the interview and that Detective Patterson's questions were not offered for the truth of the matter asserted but were "part and parcel to the statement that Ms. Lane gave when she was talking to the officer." The trial court, thereafter, reviewed the recording of Ms. Lane's approximately one-hour-long interview in its entirety.

The trial court initially found that the video recording was relevant. Then, the trial court made all of the requisite findings under both Rule 613(b) and 802(26), Tennessee Rules of Evidence, and admitted the video recording as substantive evidence with a number of redactions. Specifically, the trial court found that Ms. Lane's testimony was "pretty consistently inconsistent with her trial testimony" and that "the defense opened the door enough where this tape should be able to come in." The trial court further determined that admission of the recording did not violate the Defendant's confrontation rights, concluding that "any of the statements or questions made by the detective on the audio . . . does not impact [the Defendant's] constitutional rights in a prejudicial manner." The trial court also took great care with redacting the recording to be free of prejudicial content. However, as noted by the Defendant, the trial court did not grant his request for removal of a statement by Agent Breedlove during Ms. Lane's interview that, "[i]n most cases, the parent or step-parent kills the baby."

---

[17] Defense counsel made no other argument, merely offering citations to these rules.

-45-

After the video recording was played for the jury, Ms. Lane agreed that "what [she] testified to before [the State] played the audio recording was a little different than what was on the recording" and that her "memory [would] have been better about those events back then than it" was a trial. Ms. Lane also stated that she now recalled that her conversation with the Defendant about taking the victim to the emergency room occurred prior to her picking the Defendant up that morning. She also affirmed that she told the truth on the recording and that she did not do so merely because "they were threatening to charge her with something."

On further recross, Ms. Lane asserted that she felt like the multiple officers[18] she spoke with during the process were "telling [her] what happened instead of asking [her] what happened" and that "they were telling [her] or were planting the story in [her] head." She also stated that "she felt hostile" in the interview with Agent Breedlove and Detective Patterson and that she was still scared at the time of trial that she was "going to be charged" with something.

"The credibility of a witness may be attacked by any party, including the party calling the witness." Tenn. R. Evid. 607. Tennessee Rule of Evidence 613(b) permits impeachment of a witness with a prior inconsistent statement. The rule states,

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

The purpose of Rule 613(b) is to allow the introduction of otherwise inadmissible extrinsic evidence for the purpose of impeachment. State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998) (citing State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982)). This court has stated that extrinsic evidence of a prior inconsistent statement is appropriate if the witness "denies or does not recall making the statement" or if the witness "equivocates about making it." State v. Ackerman, 397 S.W.3d 617, 638 (Tenn. Crim. App. 2012); State v. Kendricks, 947 S.W.2d 875, 882 (Tenn. Crim. App. 1996). Normally, "prior inconsistent statements offered to impeach a witness are to be considered only on the issue of credibility, and not as substantive evidence of the truth of the matter asserted in such statements." Reece, 637 S.W.2d at 861.

However, Rule 803(26) governs the admissibility of a prior inconsistent statement as substantive evidence, stating,

---

[18] Ms. Lane testified that she "had talked to the police several times and been interviewed."

A statement otherwise admissible under Rule 613(b) [is not excluded by the hearsay rule] if all of the following conditions are satisfied:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

The Advisory Commission Comments clarify that "only prior inconsistent statements, and not consistent statements, are within the ambit of this rule." Tenn. R. Evid. 803(26), Adv. Comm'n Cmts.; see also State v. Robert Allen Zaloba, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at *20-22 (Tenn. Crim. App. Dec. 26, 2012) (explaining that Tennessee Rule of Evidence 106, the "rule of completeness," is inapplicable to statements admitted pursuant to Rule 803(26)).

Initially, we agree with the State that the Defendant has failed to provide this court with an adequate record for review because the video recording was not included in the appellate record. Here, the trial court found that Ms. Lane's statements during the interview were "consistently inconsistent" with her trial testimony and that defense counsel opened the door to the recording by asking Ms. Lane whether she had been coerced, threatened, or lied to by the officers. We cannot adequately review these determinations without viewing the recording. It is well-settled that, when a party seeks appellate review, it has a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal. See State v. Ballard, 855 S.W.2d 557, 561 (Tenn. 1993) (holding failure to include transcript precludes appellate review); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (holding trial court's ruling presumed correct in the absence of an adequate record on appeal). Where the record is incomplete, an appellate court is precluded from considering the issue. See State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

We note that Ms. Lane acknowledged, after viewing the recording, that her previous trial testimony "was a little different than what was on the recording." The prosecutor specifically addressed several statements made by Ms. Lane at trial that were inconsistent with the recording—like what time the Defendant called her for ride, when they discussed seeking medical attention for the victim, and whether she had ever left her children in the Defendant's care. Moreover, presumably the video recording directly contradicted Ms. Lane's testimony that she was berated, coerced, and threatened by Agent Breedlove and Detective Patterson during the interview. Thus, the video recording

-47-

was relevant to attack Ms. Lane's credibility. See, e.g., State v. Frederick H. Gonzales, Jr., No. M2000-03219-CCA-R3-CD, 2002 WL 31487520, at *2 (Tenn. Crim. App. Oct. 29, 2002) ("We find that the defendant cannot now complain that Ms. Wilsford's testimony regarding her motivation for assisting police was improper bolstering of her credibility when defense counsel raised the issue of her credibility when questioning another witness.") (citing State v. Harry Muse Jones, III, No. 03C01-9312-CR-00402, 1995 WL 580861, at *7-8 (Tenn. Crim. App. Oct. 4, 1995)). Also, the trial court made all of the findings required by Rule 803(26) to admit the recording as substantive evidence and took great care to redact prejudicial portions of the recording.

Regarding the specific statement where Agent Breedlove "essentially" said to Ms. Lane that "parents or step-parents were usually involved with infant deaths[,]" defense counsel argued for exclusion because it inferred the Defendant's "guilt by association." The prosecutor replied, "It's just part of the question Agent Breedlove was asking Judith Lane." The trial court, seemingly relying on the prosecutor's argument, declined to redact Agent Breedlove's statement, concluding that "under 403 and 404 that that statement is okay to come in." Without the recording, we have no ability to place Agent Breedlove's statement into context and cannot find any fault with the trial court's ruling. Moreover, any error in admitting the recording, or portions thereof, was harmless because there was ample evidence of the Defendant's guilt due to his failure to seek medical attention for the victim, making her death a certainty. See Tenn. R. App. P. 36(b) ("A final judgment . . . shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); see also Rodriguez, 254 S.W.3d at 372.

The Defendant also argues that his Confrontation Clause rights were violated by the admission of Ms. Lane's interview. However, once again, the Defendant has failed to cite any case law supporting his argument. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Nonetheless, because Detective Patterson's and Agent Breedlove's statements were not introduced for their truth but rather to provide context for Ms. Lane's responses, admission of the interview as redacted did not violate the Confrontation Clause. See State v. Derrick Sorrell, No. W2006-02766-CCA-R3-CD, 2009 WL 1025873, at *5 (Tenn. Crim. App. Apr. 8, 2009) ("The audiotape contained a conversation between the defendant and a second person and cannot be barred by the Confrontation Clause because the conversation was not offered for truth, but instead for context and evidence of knowledge."); see also State v. Lambert, 750 S.E.2d 657, 665 (W. Va. 2013) (holding "that where the out-of-court statements of a non-testifying individual are introduced into evidence solely to provide foundation or context for understanding a defendant's responses to those statements, the statements are offered for a non-hearsay purpose and the introduction of the evidence does not violate the defendant's rights"); State v. Roque, 193, 141 P.3d 368, 388-89 (Ariz. 2006) (finding that

introduction of videotaped interrogation of defendant wherein police detectives told the defendant that his wife had made statements to the detectives incriminating the defendant did not violate the Confrontation Clause). For all of these reasons, we conclude that this issue lacks merit.

## CONCLUSION

Because the evidence was insufficient to support the Defendant's conviction for voluntary manslaughter, we reverse that conviction and impose, instead, a conviction for the lesser-included offense of reckless homicide. Finding no merit to any of the Defendant's remaining issues, the Defendant's conviction for aggravated child neglect is affirmed. Consistent with this opinion, the case is remanded for imposition of amended judgment to reflect a conviction for reckless homicide with a four-year sentence to be served consecutively to the twelve-year sentence for aggravated child neglect, resulting in a total effective sentence of sixteen years.

_____
D. KELLY THOMAS, JR., JUDGE